**UNITED STATES of America**
**Plaintiff-Appellee,**

v.

**Albert TURNER, et al., Defendants.**

**In re Howard MOORE, Jr., Appellant.**

**No. 85–7504.**

United States Court of Appeals,
Eleventh Circuit.

March 30, 1987.

Morton Stavis, Center for Constitutional Rights, Rafael Anglada-Lopez, New York City, Margaret Carey, Greenville, Miss., Robert H. Turner, Selma, Ala., for appellant.

Gerald Horne, Barbara Dudley, Roxanne Gregory, Larry Smith, New York City, for amicus, National Conference of Black Lawyers, et al.

E.T. Rolison, Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.

Brenda F. Harbin, Sabrina A. McCarthy, Oakland, Cal., for amicus Association of Northern California Black Women Lawyers.

Robert L. Harris, Sherry A. Walker, James O. Cole, San Francisco, Cal., for amicus Charles Houston Bar Association.

Fred D. Gray, Thomas J. Broome, Washington, D.C., for amicus the National Bar Association.

Before RONEY, Chief Judge, CLARK, Circuit Judge and DOYLE,[*] Senior District Judge.

JAMES E. DOYLE, Senior District Judge:

This is an appeal from a judgment of contempt entered against appellant Howard Moore in a summary proceeding pursuant to Fed.R.Cr.P. 42(a). Moore is a lawyer. The contemptuous conduct was determined to have occurred during his cross-examination of a witness in a trial. A fine of $500.00 was imposed. Enforcement of the fine has been stayed, pending the outcome of this appeal. We reverse the judgment of the district court on the ground that the evidence is insufficient to support it.

## FACTS [1]

I. *Proceedings in United States v. Albert Turner, Spencer Hogue, Jr., and Evelyn Turner, Criminal No. 85–00014, prior to the critical conduct.*

The indictment charged: (1) a conspiracy, in violation of 18 U.S.C. ¶ 371, to use the mails, in violation of 18 U.S.C. § 1341, in furtherance of a scheme to defraud the citizens of Perry County, Alabama, and of the state of Alabama of a fair and impartial Democratic primary election on September 4, 1984, and, in violation of 42 U.S.C. § 1973i(e), to vote more than once in that

---

[*] Honorable James E. Doyle, Senior U.S. District Judge for the Western District of Wisconsin, sitting by designation.

1. The matters set forth in this section consist entirely of summaries of the record of the proceedings in *United States v. Albert Turner,* et al., United States District Court (S.D.Ala.), Criminal case number 85–00014, and the record of the Moore contempt proceedings within that case, Criminal Miscellaneous No. 85–00084–H, to the extent those district court records appear in the record on the present appeal from the judgment of contempt in Misc. No. 85–00084–H.

primary; (2) 26 instances of the use of the mails in furtherance of that fraudulent scheme; and (3) double-voting. Prior to trial, defendants moved for dismissal on the ground of selective and vindictive prosecution and the motion was denied.

In the course of opening statements on June 17, 1985, a J.L. Chestnut, an attorney for one of the defendants, commenced a reference to an order that had been obtained from a state court, apparently by a local prosecutor and another lawyer, just prior to the September 4, 1984, primary. The order had to do with a law enforcement plan to monitor the handling of the absentee ballots received by the elections officials. Counsel noted that both the lawyers who had obtained the order were white. The district court interrupted to summon counsel to sidebar and stated:

> Counsel, there were motions to suppress in this case taking the position that that order was illegal because it violated the confidentiality of the ballot and those motions to suppress have been denied and I don't want you now to submit to the jury the motion to suppress issue and that sounds like to me what you are doing.
>
> Also I want to make one other comment, you are mighty close, if you haven't done it, in arguing a selective vindictive prosecution to this jury.
>
> That is not an issue to be submitted to this jury and if anybody makes that argument to this jury they are going to be held in contempt and I want that clearly understood.

There followed discussion in which Chestnut said what he was trying to get at was that the local prosecutor and others "set up the thing about the absentee ballots and went and got a [state] court order and then the [local prosecutor] went down and got the U.S. Attorney involved in it and this same [local prosecutor] and a group of his cohorts in Perry County are behind it and

they seduced the United States government in this." The district court responded:

> That is a select prosecution argument if I ever heard one and if you make that argument to this jury I will hold you accountable for it.[2]

On June 19 Robert Turner, one of the attorneys for the defense, in cross-examination asked a government witness Anderson whether the race of the people involved had anything to do with how Anderson, a black man, had voted in the September 4, 1984, primary. The United States Attorney objected that the question was irrelevant. The objection was sustained. An extended sidebar discussion ensued.

In the course of it, defense counsel (not Moore) explained that Anderson's grand jury testimony revealed that when he votes, Anderson votes for white people and not black people because white people are in a position to provide black people with the material things black people need. Defense counsel stated they wished to elicit an expression of this viewpoint from Anderson in the courtroom, for impeachment purposes. Such an attitude, the defense contended, might persuade the jury that Anderson's testimony at trial was what he thought the white prosecutors, not the black defendants and black defense counsel, wanted. In the course of the discussion, the district judge said that injection of racial prejudice in the case by the defense was just as improper as would be such conduct on the part of the prosecution. He said that neither the defense nor the prosecution had the right to make an appeal to racial prejudice in the case. He said:

> I will let you ask him if he has any bias or prejudice towards the defendant or has any hard feelings toward them or anything else. I just don't want you to make an appeal to this jury based on racial prejudice and I think that that is where we are headed right now. Wheth-

---

2. The pretrial motion for dismissal for selective and vindictive prosecution and the order denying the motion are not a part of the record on this appeal. We are left to surmise that the allegedly vindictive selection was on the basis of blacks and whites. Because the parties take this for granted, we make the inference this was indeed the basis for the motion. By similar osmosis, we infer that the defendants, Hogue and the Turners, are black.

er you intend it or not, that is the result of it.

In the concluding portion of this colloquy, the following statements were made:

The Court: Well, I thought I said and if I didn't I will say that I will certainly let you inquire for credibility purposes about any bias or prejudice that he might have against the defendants or against the civic league [in which defendants were active] or against the efforts of the civic league, anything of that sort.

[Defense counsel (not Moore)]: Or against black people?

The Court: All I am ruling, at this point, for you to go into why [Anderson] did not vote for people whom he says he did not vote for is irrelevant. That's all I am saying. I am saying that this testimony, if it is offered to show that—on the subject of whether he voted or not, his grand jury testimony is inconsistent with his testimony here, it doesn't establish that, in my view, and I don't think you are entitled to go into it for that purpose.

. . . .

The Court: I don't know what else to tell you, counsel. You are asking me now for a lot of advisory opinions. I have made the only ruling I have to make, at this point.

[Defense counsel (not Moore)]: It is a narrow ruling depending upon the particular objective?

The Court: Yes, sir.

Following this colloquy, and while the witness Anderson remained on the stand, a different defense counsel (again, not Moore) conducted a cross-examination of Anderson, permitted over objection, in which there was extensive questioning concerning the witness's attitude about whites and blacks. The witness's earlier grand jury testimony about whites and blacks, referred to above, was read in the presence of the trial jury.

On June 24, 1985, the government called as its witness a Mary G. Auburtin, since 1963 clerk of the circuit court for Perry County, Alabama, whose duties included serving as absentee election manager in many elections, one of which was the September 4, 1984, Democratic primary. She testified concerning the procedures for handling applications for absentee ballots, mailing the blank ballots to the prospective absentee voters, receiving them back in the mails, stamping them as received and recording the day and hour of receipt, entering in a record that they have been received, and turning them over to the election officials. Specifically as to the absentee ballots found in her official incoming post office box on September 4, 1984, she testified to the chain of custody into the hands of the elections officials, for numbering for identification purposes and for counting in the election, and then back into her hands. She proceeded to identify certain specific absentee ballots which had been received in the September 4, 1984, primary and which the government had marked for identification and which it offered in evidence at the trial in 85–00014. She testified it was an order of a state court, entered prior to the September 4, 1984 election, which required the procedure for marking for later identification the envelopes in which absentee ballots reached Ms. Auburtin through the mail.

Early in the course of the direct examination summarized in the preceding paragraph, the following colloquy occurred:

Q What is the process that a person would have to go through to obtain an absentee ballot for that particular election?

A Well, for any election they would file an application in writing and would be mailed an absentee ballot if they are a qualified voter.

Q Did you keep a list of those names?

A Yes, ma'am.

Q Is that list available to the public?

A Yes, ma'am. Posted on the bulletin board.[3]

3. From this colloquy, it is unclear whether the list referred to is a list of qualified voters or a list of persons who have submitted applications for absentee ballots in a particular election.

From Auburtin's testimony on cross-examination, it appears that the list referred to is a list of applicants for absentee ballots. It appears there also exists a list of qualified voters.

## II. The conduct of appellant Moore giving rise to the judgment of contempt

At the conclusion of Ms. Auburtin's direct examination, a recess was taken. When court reconvened, apparently in the absence of the jury, the United States Attorney informed the court that Robert Turner, one of the defense attorneys, had requested the United States Attorney "to make available a couple of extra ballots for the cross-examination of this witness and all we ask for is a showing of what he intends to get into. It appears that it is not going to be relevant as to the chain of custody on those ballots and I don't want to get into something collateral in front of the jury. We would ask for a showing, at this time, of what he wants to go into on these ballots." The district court inquired of Robert Turner whether he objected to making such a showing, Robert Turner stated that he did object, and the district court observed that it would have to wait and see, adding that if the subject matter of the anticipated inquiry concerning the "extra ballots" proved to be collateral, the court would sustain the objection.

The United States Attorney continued: All I can see—there is a couple of these ballots. One of them, the people have an address in Tuscaloosa and if we are getting into something where there is a technical violation going on that we are not prosecuting—it makes we [sic] worry about getting into this selective prosecution thing that you previously ruled had no business in this case. If they are trying to imply something about something going on here that we are not prosecuting—

The Court: Isn't that what you are doing, Mr. Turner or no?

Mr. Moore: The answer is, no.[4]

The Court: Well, I will wait and see what we are getting into then.

[The United States Attorney]: Judge, those affidavits were part of an exhibit. As I understand the selective and vindictive prosecution, the Walker one particularly, I know it was a part of that motion.[5]

The Court: Well, we are not going beyond the direct testimony of the witness. If she is asked something that is relevant to what she said on direct, he is entitled to go into that. If he asks something that isn't, he isn't. I will have to wait and see.

Mr. Chestnut: I gather, your Honor, you are not ruling that this witness is not subject—the credibility of this witness is not subject to the same attack as any other witness?

The Court: Why sure it is.

Mr. Chestnut: Sure it is.

The Court: Certainly, I am not making any such ruling.

Appellant Moore then commenced his cross-examination of the witness Auburtin. He elicited testimony that: She performed her role as absentee ballot manager very well, checking carefully to make sure things are done properly and there is no irregularity; she tried to perform the task herself, rather than to delegate it. She identified the absentee ballots of L.G. Walker and his wife, Madge B. Walker. She testified that: L.G. Walker had been superintendent of schools in Perry county for a mighty long time, and that he had retired, probably prior to the September 4, 1984, election, although she was not positive about the time. She believed he had moved to Tuscaloosa (which is outside Perry County, although the record on this appeal does not show this) shortly before September 4, 1984. He was on the list of qualified voters as of September 4, 1984. If he had not been on the list of qualified voters, Auburtin would never have sent him an absentee ballot. It is a Board of

4. This response marks the point of first participation by appellant Moore in this sequence.

5. In the course of oral argument in this court on appeal, the United States Attorney represented that after the pretrial motion for dismissal on the grounds of selective vindictive prosecution had been denied, defendants had moved for reconsideration. In support of the latter motion, they had submitted an affidavit to which were attached the absentee ballots of the Walkers, showing that the Walkers resided outside Perry County. None of this is shown by the record on this appeal.

Registrars who decides whether a person is a qualified voter. It was not Auburtin's responsibility to determine whether L.G. Walker had moved out of town or to know how long he had been living in Tuscaloosa. This colloquy followed:

> [Moore]: And I think, Mr. Walker—Mr. and Mrs. Walker both are white, are they not?
>
> [Auburtin]: Yes, sir. They are white.
>
> The Court: Now, counsel you are getting into something for an improper purpose and beyond the scope of direct and I don't want you to pursue it any further.
>
> Mr. Moore: I take exception to that.
>
> The Court: You have an exception.
>
> Mr. Moore: I am not getting beyond the scope of direct?
>
> The Court: Well, I think you are.

III. *Proceedings in United States v. Albert Turner, Spencer Hogue, Jr. and Evelyn Turner, from the time of the critical conduct to the time of the oral finding of contempt.*

A. *Remainder of Moore's cross-examination of Auburtin*

Without further reference to the Walkers or to the race of any person, Moore continued his cross-examination of Auburtin for some time (about twenty pages of transcript). She identified several absentee ballots as to which it appeared that the execution of the ballot had been notarized on a date subsequent to the date on which it was marked as having been received by mail in the office of the election's clerk. She was unable to explain this incongruity as to any particular ballot, but stated that if she received an unnotarized ballot in the mail, and if there was time to correct the situation in this way, she would return the ballot to the voter by mail, with the suggestion that the voter have it notarized at once and then remail it to her, in a return envelope provided by her, in time to reach her by election day. If the voter acted on the suggestion, the ballot would bear a stamped date on which it was initially received by the elections clerk unnotarized, and a second stamped date on which it was received again, notarized.

Moore asked the witness whether she acted as a notary for voters who brought their absentee ballots to her office and requested her to do so. She responded that she had done so, but that since 1972 and 1974 she had done so on very few occasions. Moore produced a document which apparently showed absentee ballots she had notarized for the September 1984, and requested her to confirm, ballot by ballot, that she had done so. While she was engaged in examining the list, the court called counsel to sidebar and inquired as to the relevancy of the question. Moore contended it went to credibility; she had testified that she had done it on very few occasions; he was about to demonstrate she had done it over two dozen times for the September 1984, election. The court observed that it was only on cross-examination that the witness had first testified to the infrequency of the occasions on which she performed the function. The court inquired whether testimony concerning the frequency of her performance of that function had anything to do with matters covered on direct testimony. When Moore was unable to do more than repeat that he hoped to impeach her earlier testimony on cross-examination about infrequency, the court ordered him to pursue the subject no further. Moore stated he intended to go to another subject matter anyway and did so.

Moore then concluded his cross-examination by eliciting Auburtin's testimony concerning the hour on September 4, 1984, when Auburtin went to the post office to pick up 580 absentee ballots which had been placed in her post office box, where she took them, how she processed them, when she delivered them to the election officials, when they were returned to her by the election officials, where she then stored them, and when and to whom she eventually transferred them. None of this latter testimony appears to be inconsistent with what Auburtin had said on direct or to bear on any bias or prejudice on her part.

B. *District court's inquiry into Moore's purpose and its oral finding of contempt*

At the end of the trial day, after the jury had been excused, the court invited Moore

to explain the relevance of his questions concerning L.G. Walker in general and Walker's race in particular. Moore responded that his purpose had been to show Auburtin knew the Walkers had left the county several years earlier. Asked what bearing the Walkers' move had on Auburtin's credibility, Moore responded it bore on Auburtin's testimony that she is a very careful clerk who does things efficiently and according to regulations; she had been presented by the government on direct examination as a careful person whose testimony on the chain of custody of the ballots should be accepted as true; Moore had been trying to reveal her as not careful, as sloppy and biased.

The court inquired whether under Alabama law, if Walker was on the registered list of voters, Auburtin had the right to reject his ballot if in her opinion Walker was not qualified. Moore responded that he could not say what Alabama law was on the point. The court inquired whether Moore had been suggesting that Auburtin should have rejected Walker's ballot. Moore responded that Auburtin was experienced and knowledgeable about voter eligibility and she would have been countenancing voting in the county by a prominent public figure like Walker who was ineligible to do so. The court asked whether Moore meant that Auburtin was required by Alabama law to determine voter eligibility before mailing out an absentee ballot. Moore responded that he did not know what Auburtin's testimony had been on that.

The court then asked the relevancy of Moore's question about the Walkers' race. The colloquy concluded as follows:

> Mr. Moore: She [Auburtin] has a bias in favor of people who are white. She has a bias, I believe, in favor of people who are black and allied with white people and since my client and the DCCL is presently—is a black organization working on behalf of black people in the county, she would do what she could to undermine their activities.

The Court: You think the fact that she did not reject or take some action with reference to Mr. Walker's ballot shows racial bias on her part, is that your theory?

Mr. Moore: It is certainly some evidence of that as the jury, as the triers of the facts, would or could conclude that.

The Court: Well, I understand what you are telling me. I am going to tell you frankly what I think. I think that what you are doing is attempting to inject race improperly into this case, that you are attempting to indicate that whites can violate the law and not be prosecuted for it, which is not an issue for this jury and I find that you have done that contrary to my instructions that you not do that which instructions are a matter of record and I find you in contempt for having done that and so that there will be no question of objectivity about it, I will, at some later time, ask another judge to handle the contempt hearing.[6]

## IV. *Further proceedings after oral finding of contempt*

### A. *Colloquy between court and Moore's attorney on June 25*

On the following morning, June 25, in the absence of the jury, Morton Stavis, requested an opportunity, in part as counsel for Moore in the contempt matter and in part as counsel for defendant Evelyn Turner, to make some comments in light of the court's comments to Moore at the end of the day on June 24. Specifying that the court was not willing to have a hearing on the Moore contempt at that time, the court permitted Stavis to proceed.

Stavis's remarks may be summarized in part as follows: An important issue in the case against the Turners and Hogue is whether certain absentee ballots bearing signs of alteration were altered by defendants or by someone else. The chain of custody of the ballots, including the period after they reached the post office, is highly

---

**6.** With one exception, references in this opinion to the district judge and the district court are to District Judge Emmett L. Cox. The one excep-

tion is that the district judge who ultimately determined the sentence, at Judge Cox's request, is Chief District Judge William B. Hand.

relevant. Auburtin is the prosecutor's first and most important witness on that segment of the chain of custody. She is presented by the prosecutor as a paragon of neutrality. In truth she is a strong political partisan. She had long held the elective position of clerk of court, without challenge. In about 1980, the Perry County Civic League, with which defendants are associated, fielded a candidate against her. She became a leader in the anti-League forces. In a larger perspective, since the 1965 Voting Rights Act, the struggle between the League and its opponents is a racial struggle, with the League as a political vehicle for the realization of black aspirations. The defense desires to reveal all this to the trial jury as it bears on the credibility of Auburtin. This is not an effort to revive the issue of selective vindictive prosecution.

With respect to Moore, Stavis requested the court to make clear that the only court order implicated was the prohibition against pursuing further a selective vindictive prosecution claim, to recognize that Moore had acted without intention to violate that prohibition, and to rescind the finding of contempt. More generally, as a guide to Stavis and other counsel for the remainder of the trial, Stavis requested the court to make clear that the court's comments about race were directed exclusively to attempts to pursue a selective vindictive prosecution claim and that there was no broader prohibition against references to race.

The district court's response may be summarized in part as follows: There are two things the court has asked counsel not to do. The first is not to undertake to argue or present to the jury the selective prosecution issue. The second is not to attempt to win a verdict from the jury based on an appeal to racial bias or prejudice. As to what role race properly plays in the case, counsel are entitled on cross-examination to pursue whether a witness harbors racial bias or prejudice. What Stavis says he wants to pursue with the witness Auburtin is quite different from what Moore pursued with her. Moore pursued a line of inquiry as to the voter Walker.

Moore has told the court Moore did so on the theory that L.G. Walker, and maybe Mrs. Walker, were not qualified to vote absentee, Auburtin knew that, and Auburtin had done nothing about it. Moore's supposed theory is that these circumstances make it more probable than not that Auburtin harbors prejudice in favor of whites and against blacks. But there was no testimony that Auburtin had done anything in any other case to disqualify a voter, white or black. There was no evidence she had treated blacks differently from whites. Moore's line of questioning did not tend to show racial prejudice on the part of Auburtin. Despite what Moore said about his purpose, the court thinks this is not why Moore pursued his line of questioning. The court thinks Moore pursued it for the reason the court said he pursued it. The court will not withdraw its finding that Moore is in contempt. The line is a fine line, but the court is obliged to draw it. There are two "no no's." One is the selective prosecution area and the other is an effort by defense counsel to appeal to racial bias and prejudice on the part of jurors in order to produce a verdict in their favor. As for exigent circumstances, there has been a threat, beginning with opening statements, that this selective prosecution issue would be injected into this case and the court found it necessary to make a summary adjudication of contempt to prevent further misconduct and impropriety of that sort in this case.

### B. *Completion of cross-examination of Auburtin by other defense counsel*

Thereupon, Auburtin resumed the stand and Stavis cross-examined her at length (22 pages of transcript). Stavis elicited testimony from Auburtin that: it was after 1965 when blacks first started registering to vote; it was in 1976 that blacks were first elected as county commissioners; one of them was a Reese Billingslea; in 1980, defendant Albert Turner asked Auburtin to vote against Billingslea, but Auburtin responded she was going to vote for Billingslea; in 1982, when defendant Albert Turn-

er ran for probate judge, Auburtin did not vote for him. Auburtin denied that she had got out and said whom she was for and against; that she had said she would "get" Albert Turner; and that she had "split" with the Perry County Civic League.

C. *Court's Certificate of July 8, 1985*

Stating that it was doing so pursuant to Fed.R.Cr.P. 42(a), the court entered a written certificate on July 8, 1985. It may be summarized as follows:

The trial had been one in which racial overtones could have tainted the objectivity of the jury, if not conscientiously managed. Prior to trial, the court had denied defendants' motion to dismiss on the basis of selective or vindictive prosecution. During J.L. Chestnut's opening statement, the court informed all counsel that the selective vindictive prosecution issue should not be presented to the jury. On "at least one other occasion," later in the trial, the court had informed counsel it "would not allow race to be improperly injected into the trial." At a point in his cross-examination of Auburtin, who is white, Moore asked her what was the race of the Walkers and she answered they are white. At the end of the day, in response to the court's inquiry, Moore had said his purpose was to show racial bias on the part of Auburtin by showing she had allowed ineligible white voters to vote absentee. The court was of the opinion this was not Moore's true intention, but rather that Moore's purpose was to suggest to the jury that whites were violating the law and not being prosecuted for it and to inject race improperly into the case. There was no evidence presented that Auburtin had ever disqualified, or taken steps to have disqualified, any voter, white or black, on the ground that the voter was not a resident, and no evidence that Auburtin had authority to do so. Moore's conduct was in wilful and deliberate violation of the court's prior orders. Moore knew he was exceeding the limits of vigorous advocacy and was hindering rather than facilitating the search for the truth.

The exigency was the need to punish Moore for his misconduct and to deter further misconduct of that kind during the trial. An immediate finding of contempt was a sufficient response to this exigency. Immediacy in the punishment was not required as a deterrent. Therefore, to prevent intimation of bias on the part of the court, provision was made for another judge later to determine the appropriate punishment.

D. *Motion of July 24, 1985, for reconsideration of July 8, 1985, certification*

Moore's motion for reconsideration rested principally on contentions that: (1) a summary proceeding under Rule 42(a) was impermissible because there was no actual obstruction of justice or immediate threat of disruption of the proceedings (Moore had immediately ceased to pursue the questioning on the race of the Walkers and its possible significance); (2) Moore's question to Auburtin concerning the race of the Walkers suggested nothing with respect to selective vindictive prosecution and it was not an improper injection of race into the trial; and (3) it was improper for the presiding judge to refer to another judge the matter of punishment. On July 25, 1985, the district court granted reconsideration but, without further explanation, declined to rescind or modify its July 8, 1985 certification of contempt.

E. *July 26, 1985 hearing before Chief Judge Hand on nature of punishment*

Chief Judge Hand commenced by emphasizing that his exclusive role was to decide what penalty should be imposed upon Moore for the contempt of which he had been found guilty by Judge Cox. Chief Judge Hand was not engaged in appellate review of the findings of guilt, although he was prepared to hear anything in mitigation of punishment. He had reviewed "the record that has been furnished" and had no need to be advised of what it contained. Appearing as Moore's attorney in the contempt proceedings, Morton Stavis suggested that the trial record furnished to Judge

Hand was not complete and failed to reveal occurrences, prior to the moment of Moore's offending question, that bore on Moore's understanding of what the court had prohibited. Stavis offered to present the live testimony of four lawyers who had participated in the trial, other than Stavis and Moore, as to their understanding, at the time of Moore's offending question, of the state of the trial court record. Stavis suggested that such testimony would be relevant to the presence or absence of willfulness on Moore's part and would go to mitigation as well as to guilt or innocence. Judge Hand responded that such evidence would go to the propriety of the earlier finding of contempt and declined to hear it.

With Judge Hand's permission, Moore than made a statement to this effect: He never intended to put before the jury any evidence pertaining to a defense of selective prosecution. The defense presented to the jury was that the absentee voters had consented to any changes that appeared on their ballots and there was no criminal conduct by the defendants. A defense of selective prosecution would have undermined that defense of innocence. As to the matter of injecting race into the trial improperly, Moore was mindful at all times that the jury was bi-racial. Any racial question had to be handled with delicacy. Moore's question to Auburtin about the Walkers' race was intended to reflect bias on Auburtin's part.

Judge Hand asked what Moore had expected that would have reflected disparate treatment over which Auburtin had some control. Moore responded that Auburtin had testified on direct that when requested to send applications for absentee ballots, she sent them to qualified voters. Moore inferred from this at the time that Auburtin made determinations whether the requesters were qualified voters. She had some responsibility in sending out those ballots. Auburtin knew the Walkers lived outside the county, but she sent them absentee ballots. Judge Hand asked whether, before Moore asked Auburtin about the Walkers' race, Moore knew what Auburtin's authority was with respect to determining the qualifications of voters. Moore

responded that he had not known the full magnitude of her authority, but that the defense had researched the question of where the Walkers resided at the time. Judge Hand observed that if Moore had no evidence that Auburtin selectively determined that absentee ballots would be sent to whites but not to blacks on the list of qualified voters, the question about the Walkers' race was totally irrelevant. Moore responded that Judge Cox had held Moore in contempt because Judge Cox considered the offending question irrelevant.

Moore referred again to testimony by Auburtin on direct which had indicated to Moore that Auburtin made the determination whether or not voters were qualified. He specified her statement on direct that persons desiring absentee ballots were required to file written applications and they "would be mailed an absentee ballot if they are a qualified voter." Moore acknowledged that during his cross-examination of Auburtin, she had testified that in deciding whether to send an absentee ballot to an applicant, Auburtin went by the list of qualified voters, "but at the time I began my cross examination of her, I believe it misstates the record to say that, and that's what I believed at that time.... But with respect to other questions developing her treatment, if any, with respect to black voters, and we were cut off from that because the judge told me at the time I asked the question, don't go into that any further which I didn't do. There was not a single questioning by me to this witness about any racial aspect of the case. When the judge said do not go into that any further, there was complete cessation of anything in that matter, and then another examination of something else for some 18 pages."

Judge Hand repeated his question whether at the time Moore had had any information that would show Auburtin had authority to determine whether a person was qualified to vote. As Moore's attorney, Stavis interjected that aside from the determination of who is a qualified voter, the issue here was the mailing of an absentee ballot. Judge Hand disagreed, noting that absen-

tee ballots can be sent anywhere in the world, so the issue could only be whether Auburtin had authority to delineate (between persons qualified to vote and persons not qualified). Moore responded that because Auburtin testified that she returned ballots, Moore believed she had authority to determine who was qualified and who was not. Judge Hand noted Auburtin had returned ballots because they had been improperly executed, not because they had been cast by persons who did not have the franchise to vote. Moore said there were two bases for his belief that Auburtin had authority to determine qualification for voting. The first was the passage in her testimony on direct to which he had already referred twice. Moore did not think this testimony by Auburtin was a statement of Alabama law on the point, but it was an assertion by her that she possessed that authority. Moore stated the second basis for his belief was "her handling of—." He was interrupted by the court. It was not clear whether he ever returned to that point, but it appears he did and that this second basis was the manner in which Auburtin handled some ballots that appeared to have been notarized at a time later than the time they were received in the mail at Auburtin's office.

Finally, Judge Hand asked Moore where he had been prepared to go with his questioning after Auburtin had testified that the Walkers were white. Moore said he would have confronted her on the question of the time the Walkers moved out of Perry County. "She said within two months of the election or a short period, I believe are her words, and I would have put before her a document of documentary evidence that indicated the voters had moved out of the county two years ago.[7] I would have gone that far at least. After that point, I don't know if I would continue that line of examination or not. I would have gone on to the next line of examination...." Moore then described the questioning he had in fact engaged in concerning apparent discrepancies between the dates on which several ballots had been stamped as received in Auburtin's office and the later dates on which they appeared to have been notarized. Moore considered those circumstances highly irregular and incompatible with Auburtin's contention that she was very helpful and a paragon of regularity in her handling of absentee ballots.

## OPINION

On this appeal, Moore contends that: there was no court order of sufficient clarity and specificity; the circumstances did not justify resort to a summary form of contempt proceedings; Moore's question neither obstructed nor threatened to obstruct justice; there was no violation of a court order; Moore lacked the requisite intent to violate the court's orders; the district court lacked power to proceed summarily after the end of the trial; and the district court's Fed.R.Cr.P. 42(a) certificate is insufficient. These contentions will be addressed in this opinion but in different sequence. We will proceed, first, to consider the validity of the judgment of conviction, had the district court not chosen to proceed as it did in the summary manner provided for in Fed.R.Cr.P. 42(a), but rather had proceeded in the more deliberate manner provided for in 42(b). We will go on to consider thereafter the effect of the district court's election to proceed summarily.

The power of a federal court to punish by fine or imprisonment a contempt of its authority is limited by 18 U.S.C. § 401 to: "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; and (3) Disobedience to its lawful writ, process, order, rule, decree, or command." Category (2) is not implicated here; a combination of (1) and (3) is. Moore has been punished by fine based on a determination that he was disobedient to a lawful order of the district court and that this misbehavior occurred in the presence of the court. Moore's behavior has clearly

---

**7.** Auburtin's actual testimony on Moore's cross-examination was: "[L.G. Walker] had moved to Tuscaloosa shortly before this election, I believe."

been treated as criminal contempt, not civil, as the district court recognized explicitly and by invoking Fed.R.Cr.P. 42 in its certification.

### I. *Sufficiency of the evidence*

For the purpose of examining the sufficiency of the evidence, we will approach the case as if it had been initiated and adjudicated in the manner in which criminal prosecutions are usually initiated and adjudicated. That is, we will approach it as if an indictment or information had been filed against Moore, he had pleaded not guilty, and a non-jury trial had been held in which testimony and documentary evidence had been received. For this purpose, it is as if the presiding judge had filed the charge on behalf of the United States, had served as the prosecutor, had presented the evidence for the prosecution by calling himself to the stand to testify to what he had himself seen and heard, had offered in evidence relevant portions of the record of earlier proceedings in the case, and had then proceeded as trier of fact to evaluate this evidence to determine whether the prosecution had met its burden of proof.

■■■ The essential elements of the criminal contempt for which punishment has been imposed on Moore are that the court entered a lawful order of reasonable specificity, Moore violated it, and the violation was wilful. Guilt may be determined and punishment imposed only if each of these elements has been proved beyond a reasonable doubt. *Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Railway Co.*, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911); *In re Stewart*, 571 F.2d 958 (5th Cir.1978). In its certification, the district court did not make an explicit finding as to each of these three elements, but did so implicitly. Also, it did not make explicit that it was applying the proper standard of proof in reaching its findings. Because it was bound to do so, we conclude that this was the standard the district court applied.

In reviewing the sufficiency of the evidence in support of a conviction in a criminal case following a non-jury trial, we must decide whether:

> the evidence would permit the trier of fact to find the defendant guilty beyond a reasonable doubt, *Gordon v. United States*, 438 F.2d 858, 867 (5 Cir. [1971]). The judgment of conviction must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.... A finding of guilty, whether at the hands of court or jury, is not to be overturned unless there is no substantial evidence to support it.

*United States v. Schechter*, 475 F.2d 1099, 1101 (5th Cir.), *cert. denied*, 414 U.S. 825, 94 S.Ct. 127, 38 L.Ed.2d 58 (1973).

> Since [defendant] was tried by the court, without a jury, our task in reviewing the findings of the trial court is to determine whether such findings are supported by any substantial evidence. It is not our function to make credibility choices or to pass upon the weight of the evidence. The test is whether the evidence is sufficient to justify the trial judge, as trier of the facts, in concluding beyond a reasonable doubt that the defendant was guilty, and that such evidence is inconsistent with any reasonable hypothesis of his innocence. Such is the substantial evidence test.

*Gordon v. United States*, 438 F.2d 858, 868 n. 30 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 142, 30 L.Ed.2d 56 (1971).

### A. *The sufficiency of the evidence as to the first element: the entry of the orders and their specificity.*

The entire body of evidence concerning the entry and content of the relevant orders, set forth in detail in the facts section, *supra*, may be summarized as follows in part 1 of this section I(A).

#### 1.

When in opening statement on June 17, 1985, J.L. Chestnut, one of the defense attorneys, noted that the two lawyers who had obtained a certain order from a state

court were white, Judge Cox initiated a sidebar conference.[8] During the sidebar, the judge said Chestnut was mighty close, if he hadn't already done it, in arguing a selective vindictive prosecution to this jury. The judge said this was "not an issue to be submitted to this jury and if anybody makes that argument to this jury they are going to be held in contempt and I want that clearly understood." From other portions of the record, it can be inferred reasonably that those who heard this oral order understood the "selective vindictive prosecution issue" to be the issue which had been raised by an unsuccessful pretrial defense motion to dismiss, and, as noted above, we are assuming that the selectivity and vindictiveness asserted in that motion related to disparity in treatment of blacks and whites. Chestnut told the court he was trying to make a contention that the local prosecutor and his cohorts had set up the thing about absentee ballots, had obtained a certain order from a state court, had gotten the United States Attorney involved in it, and had seduced the United States government in it. The district court responded: "That is a select prosecution argument if I ever heard one and if you make that argument to this jury I will hold you accountable for it."

On June 19 during the cross-examination of government witness Anderson, who is black, by Robert Turner, one of the attorneys for the defense, Anderson was asked whether the race of the people involved had anything to do with how Anderson had voted in the September 4, 1984, primary. An objection was sustained and a sidebar conference ensued.[9] In the course of it, the court said that neither the defense nor the prosecution had a right to appeal to racial prejudice in the case. The court did not want an appeal made to the jury based on racial prejudice. The court said the defense was free to ask Williams whether he has any bias, prejudice or hard feelings against the defendants. For credibility purposes, the defense could inquire of

Williams about any bias or prejudice he might have against the defendants, or against the civic league in which defendants were active, or against the efforts of the civic league, anything of that sort. When a defense attorney (not Moore) asked, "Or against black people?", the court did not respond directly, saying questions asked of Williams about why he had not voted for certain candidates in the primary were not relevant.

On June 24, Auburtin was called by the government and her direct examination was completed. In the absence of the jury, the prosecutor then informed the court that the defense had requested and obtained from the prosecutor a number of absentee ballots that had not been discussed by Auburtin on direct. Among those requested were those of the Walkers. The prosecution was apprehensive that the defense intended to use these "extra" absentee ballots to get into "this selective prosecution thing." The prosecution represented that the Walker ballots had been part of an exhibit relating to the pretrial motion for dismissal for selective prosecution. In response to the court's inquiry whether the defense was about to get into the selective prosecution matter, Moore answered no. The court stated that it would have to wait and see; the defense was entitled to cross-examine Auburtin on things relevant to her testimony on direct, but not on things not relevant to her direct. Asked by Chestnut whether the credibility of Auburtin was subject to the same attack as that of any other witness, the court responded that it certainly was so subject.

**2.**

No further relevant orders had been entered by the court prior to the moment Moore asked Auburtin the offending question. The orders in effect at that time are fairly summarized as follows:

---

**8.** The record on appeal does not show whether Moore was within earshot during this sidebar, but Moore makes no point of it and we will assume he was.

**9.** The record does not show whether Moore was within earshot during this conference, but Moore makes no point of it and we will assume he was.

(1) Defense counsel were forbidden to argue to the jury or to "submit" to the jury the issue of selective vindictive prosecution.

(2) All counsel were forbidden to inject racial prejudice into the case or to make an appeal to racial prejudice in the case. This prohibition did not prevent attacks upon the credibility of witnesses. It was permissible to inquire into witnesses' bias or prejudice against the defendants or against the civic league in which they were active or against the activities of the civic league or anything of that sort.

■ Thus, there was substantial evidence to support a finding by the trial court, beyond a reasonable doubt, that prior to Moore's offending question, the court had promulgated two relevant verbal orders and that the language of those two orders was as we have just summarized it.[10] There remains the question whether the orders were reasonably specific.

### 3.

■ To support a conviction for criminal contempt for violation of an order of a court, the order must be reasonably specific. *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir.1974); *Traub v. United States*, 232 F.2d 43, 47 (D.C.Cir.1955). *See International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); Fed.R.Civ.P. 65(d). The reasonableness of the specificity of an order is a question of fact and must be evaluated in the context in which it is entered and the audience to which it is addressed. For example, it may well be necessary that the specificity of orders directed to laypersons be greater than that of orders to lawyers. *See In re Williams*, 509 F.2d 949, 960 (2d Cir.1975).

Standing alone, the language of the order on selective prosecution is imprecise. It does not identify the substance of the selective or vindictive prosecution contention to which the court is referring. It speaks of "submitting" the issue to the jury and making "that argument" to the jury. It does not mention the content of questions counsel might put to witnesses.

■ However, we bear in mind the standard for our review of the sufficiency of the evidence. As we have said, despite the omissions from the record on this appeal, we think it possible to infer that in context Moore and the other trial counsel could have correctly understood what contention the court was referring to, that is, the contention embodied in the pretrial motion to dismiss on the ground of selective and vindictive prosecution, and could have correctly understood that the kind of selectivity and vindictiveness in question was blacks-whites. Also, we think it possible to infer that trial counsel, as contrasted with laypersons, could have understood that asking questions of witnesses was covered by the court's reference to "submissions" to the jury. Not without difficulty, we conclude that the evidence before the district court was sufficiently substantial to support its implied finding beyond a reasonable doubt that the order on selective prosecution was reasonably specific.

We are unable to reach a similar conclusion concerning the order on injecting racial prejudice. The district court has stated that the "trial of this case was one in which racial overtones, if not conscientiously managed, could destroy an effective search for the truth by tainting the objectivity of the jury." Presumably, this was a recognition of a trial context in which politics and an election were center-ring and among the actors in that center-ring was a civic league which appears to be race conscious in some degree and whose political objectives are not shared by the entire community. Surely an effort by the court to avert problems was not unwarranted. Of course, if specificity were the only value at stake, the court might have ordered that during the trial and in the presence of the jury, no

---

**10.** For brevity we will refer to the first of the two orders as the order on selective prosecution (not the pretrial order denying the motion to dismiss, but the oral order made during trial) and the order on injecting racial prejudice.

counsel was to make any reference, direct or indirect, to the race of any person. But specificity was not the only value at stake, and such a flat and universal order might well itself have destroyed an effective search for the truth.

One alternative was to permit counsel to inquire into racial matters for the sole purpose of demonstrating racial prejudice on the part of a witness. Prior to the moment of Moore's offending question, the district court had stated that it would permit counsel to inquire into possible bias or prejudice on the part of government witness Anderson against the defendants or their civic league. But the court had not been forthcoming on whether the bias which was a permissible subject of inquiry included racial bias, and, if so, whether references to race could be made solely in the course of impeachment efforts.

The court had been content to leave the prohibited conduct defined no more clearly than injection of racial prejudice into the case and appealing to the jury on the basis of racial prejudice. In colloquy the morning after Moore's offending question had been put and the oral finding of contempt had been entered, the court stated: "The line is a fine line, but the court is obliged to draw it." The problem is not that a line drawn by the court prior to Moore's offending question was a fine line. The problem is that no line had been drawn.

■ Even applying the severely restricted standard of review, we conclude that, as of the moment Moore asked the offending question, there was no substantial evidence to support a finding by the district court, beyond a reasonable doubt, that a reasonably specific relevant order had been promulgated on the subject of injecting racial bias in the case.

B. *The sufficiency of the evidence as to the second element: whether, without regard to wilfulness, Moore's conduct constituted a violation of either or both of the district court's orders*

### 1.

■ Whatever its precise contours, the order on selective prosecution obviously goes to conduct on the part of prosecutors: in this case, the United States Attorney or, perhaps by indirection, the local prosecutor. Selective prosecution does not go to conduct on the part of voters like the Walkers, such as voting in a county in which they no longer were entitled to vote because of a change in residence. It does not go to conduct on the part of elections officials like Auburtin, such as accepting absentee ballots from persons whose residence does not entitle them to vote in the county. It is true that Moore's questions of Auburtin might have been followed by inquiry whether Auburtin had been prosecuted for accepting absentee ballots from the Walkers or whether the Walkers had been prosecuted for voting absentee in a county in which they no longer resided. The prosecutor and the judge may well have been apprehensive that such questions were forthcoming. Interruption of the questioning, inquiry, precise additional warnings might have been appropriate. Here the court did interrupt the moment Auburtin answered Moore's question by saying the Walkers were white, and prevented Moore from asking the kind of further questions the court may have anticipated. The result was that absolutely nothing was heard by the jury that even suggested the United States Attorney or the local prosecutor had refrained from prosecuting, or instigating the prosecution of the white Walkers or the white Auburtin, while prosecuting the defendants. There was no evidence, substantial or otherwise, to support a finding by the district court beyond a reasonable doubt that Moore argued the selective prosecution issue to the jury or "submitted" that issue to the jury in the form of the offending question to the witness Auburtin.

### 2.

■ With respect to the order on injecting racial prejudice, because the district court was not warranted in finding it reasonably specific beyond a reasonable doubt, it is unnecessary to consider whether Moore's conduct violated the order. Never-

theless, brief comment may be appropriate. Even an egregiously vague order may be thought adequate to cover conduct so gross as to fall within its core. For example, had Moore expressly urged the jury to acquit his client simply because the prosecutor is white and the client black, his conduct might be found to fall within the court's vague order. But Moore's question to Auburtin about the Walkers' race does not even remotely approach such grossness. His question may well have been a prelude to some gross injection of or appeal to racial prejudice. If so, Moore has only the court's prompt and forceful interjection to thank for his avoidance of criminal contempt. But saved from such transgression Moore surely was. No injection of racial prejudice occurred. No appeal to racial prejudice was made. There is no substantial evidence to support a finding by the district court, beyond a reasonable doubt, that, without regard to wilfulness, Moore violated the order on injecting racial prejudice.

### C. *The sufficiency of the evidence as to the third element: wilfulness*

We have determined that there was substantial evidence to support a finding by the district court, beyond a reasonable doubt, that the order on selective prosecution was reasonably specific, but the evidence was insufficient to support such a finding that Moore's conduct, even if wilful, violated the order.

We have determined that there was not substantial evidence to support a finding by the district court, beyond a reasonable doubt, either that the order on injecting racial prejudice was reasonably specific, or even assuming the order was reasonably specific, that Moore's conduct, even if wilful, violated it.

It is unnecessary to consider whether Moore's conduct was wilful, as to either of the two orders. Nevertheless, because both Judge Cox and Chief Judge Hand inquired so closely into Moore's purpose in asking the question and appear to have been significantly influenced by the inadequacy of his response, we add a comment.

We agree that Moore's attempted explanations, directly at the end of the day of the incident on June 24, through his counsel on the morning of June 25, through his counsel in the July 24 motion for reconsideration, and directly on July 26 before Chief Judge Hand, were a study in evasion and opacity.

1. Moore stated his purpose was to show that Auburtin's performance as an elections official was sloppy, not careful or efficient; the Walkers' race is totally irrelevant to this purpose.

2. Moore stated his purpose was to impeach Auburtin's testimony by demonstrating racial bias. She had accepted and processed the Walkers' absentee ballots. Prior to trial, Moore had obtained information indicating that the Walkers had moved from Perry County to Tuscaloosa some time prior to the September 4, 1984, Democratic primary and were barred by Alabama law from voting in Perry County in that election. Moore had no information that Auburtin had refused to accept and process an absentee ballot from a black person in similar circumstances.

3. Moore did not know whether Alabama law empowered or required Auburtin to make the determination whether an absentee voter's residence elsewhere disqualified the voter from employing an absentee ballot in Perry County. Moore had heard Auburtin testify on direct that when requested to send applications for absentee ballots, she sent them to qualified voters. Moore emphasized that he had inferred from this testimony that Auburtin did make determinations whether requesters were qualified voters. Moore stated that when he began his cross-examination of Auburtin, he believed Auburtin possessed the power or duty to make such a determination. But Moore acknowledged that in his cross-examination of Auburtin prior to his offending question about the Walkers' race, Auburtin had said that in deciding whether to send an absentee ballot to an applicant, Auburtin went by the list of qualified voters. (Indeed, at that point in Moore's cross-examination, Auburtin had testified that if L.G. Walker had not been

on the list of qualified voters, Auburtin would never have sent an absentee ballot; it is the Board of Registrars who decides whether a person is a qualified voter; it was not Auburtin's responsibility to determine whether or when L.G. Walker had moved out of Perry County.)

It was not clearly erroneous for the district court to find as false Moore's attempted exculpatory statements, made to the district court prior to its determination of guilt. False exculpatory statements may be regarded as probative of a bad purpose on the part of a defendant as of the time of commission of the critical act. Possibly, Moore's evasions might be viewed as evidence which, when taken with the rest, raise the aggregate to a level of substantiality and permit the district court's finding of wilfulness, beyond a reasonable doubt, to survive. Even if all this were resolved adversely to Moore, however, the conviction cannot stand. In the case of a crime consisting of three essential elements, of which wilfulness is third, a substantially supported finding of wilfulness is insufficient to support a conviction if substantial evidence is absent as to either or both of the first and second essential elements.

We conclude that the evidence is insufficient to support the district court's finding that each of the three essential elements of the criminal contempt was proven beyond a reasonable doubt.

## II. *The resort to summary procedure*

■ Throughout part I of this opinion, we have proceeded on an assumption, not based in fact, that the criminal contempt proceedings resembled in deliberateness and caution the proceedings that attend trials in criminal cases, generally. In fact, the district court chose to proceed under Fed.R.Cr.P. 42(a) which provides: "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." The district court's certification of July 8 expressly contains neither of these propositions, but unmistak-

ably implies both. The record demonstrates that the explicit pre-conditions to resort to Rule 42(a) were met in this case. However, authoritative judicial precedent embodies at least one further pre-condition: that there has been an actual obstruction of justice. *In re McConnell,* 370 U.S. 230, 234, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962).

■ We do not suggest that for a lawyer to commit a single deliberate violation of an order of a court governing the conduct of an inherently difficult trial is less than a grave offense. But in the entire context in which Moore put the offending question to Auburtin, a context we have described at length and with care, we cannot accept that even if it constituted a clear violation of a clear order, the single question and the answer it evoked constituted an actual obstruction of justice, permitting resort to Rule 42(a). The decision whether to resort to Rule 42(a) summary procedure, as contrasted with Rule 42(b)'s more elaborate procedure, is spoken of as a matter of discretion. Viewed in those terms, we conclude the discretion was abused.

## III. *Order*

The judgment of criminal contempt appealed from is REVERSED and the case is REMANDED for entry of an order dismissing the contempt proceeding on its merits.