PITTMAN, Judge.
The Madison County Department of Human Resources (“DHR”) and its assistant director, Tyron Newton, appeal from a September 13, 2012, order of Madison Juvenile Court Judge Claude E. Hundley III, finding them in criminal contempt of court for their willful disobedience of a court order. As a contempt sanction, Judge Hundley sentenced Newton to pay a fine of $2,000 by 9:00 a.m. on September 17, 2012, or to turn himself into the jail for five days’ incarceration plus pay the fine. DHR and Newton sought a writ of mandamus from this court, directing Judge Hundley to vacate his order holding Newton and DHR in contempt. We treat the petition as an appeal from an adjudication of contempt, pursuant to Rule 70A(g)(2), Ala. R. Civ. P., and we reverse the finding of contempt.[1]
The underlying action is a dependency action involving 13-year-old C.C., who had been in the custody of his maternal grandparents while his parents were incarcerated. On January 30, 2012, after the mother was released from incarceration, she and the maternal grandmother petitioned the juvenile court to transfer custody back to the mother. The juvenile court requested that DHR perform a home study.
Judge Hundley held a hearing on June 11, 2012, at which he received evidence indicating that the maternal grandmother’s residence was unsanitary; that there were 16 dogs kept inside the residence; and that the mother had been living in the maternal grandmother’s residence until March 9, 2012, when she had tested positive for the presence of cocaine and marijuana and DHR had required that she move out of the residence. In addition, the court was presented with evidence indicating that the maternal grandparents, who had recently been incarcerated (and were currently on probation) for a truancy offense, were unable to make C.C. obey their rules and attend school. At the hearing, Judge Hundley ordered immediate drug testing of the maternal grandmother, the mother, and C.C. The mother’s and C.C.’s tests were positive for illegal drugs; the maternal grandmother’s test indicated the presence of numerous medications. The court granted DHR shelter-care custody of C.C. and set a hearing for August *487 16, 2012, regarding legal custody. DHR placed C.C. in foster care.
On June 21, 2012, Judge Hundley held a hearing to determine the whereabouts of C.C., who had been missing for two weeks after having run away from the maternal grandmother’s home when he learned that he was to be placed in foster care. The mother and the maternal grandparents denied knowing C.C.’s whereabouts. However, after C.C.’s maternal great-grandfather testified that C.C. was at the maternal grandmother’s residence, Judge Hundley ordered that the mother and the maternal grandparents be jailed until C.C. was found. When C.C. was located two days later, he tested positive for the presence of drugs.
At the beginning of the hearing on August 16, 2012, counsel for DHR informed the court that, because of C.C.’s proclivity to run away, DHR had made attempts to place him in five different secure facilities, but all the facilities had declined to accept him, based on his behavior, his age, or, in the case of The Bridge — an inpatient drug-treatment facility — because C.C.’s most recent drug test on July 19, 2012, had been negative and he was not, therefore, deemed to be “in crisis” so as to meet the admission criteria. Karnetris Langford, C.C.’s caseworker, testified that C.C. had been diagnosed as suffering from a generalized anxiety disorder, had been taking medication for that condition, and had been counseled by Jose Rivera, a child and adolescent therapist at the Madison County Mental Health Center.
Langford had received a report from the counselors at the Harris Home for Boys (a placement from which C.C. had also run away) indicating that C.C. had admitted that, before he had come into DHR’s custody, he had been using drugs on a daily basis. Langford stated that Rivera had recommended that DHR enroll C.C. in an intensive outpatient drug-treatment program. Carolyn Harris, Langford’s supervisor, recommended that C.C. remain in DHR’s custody so that DHR “could continue to seek a treatment facility for him as directed by [Judge Hundley].”[2] When the guardian ad litem asked Harris whether DHR was willing to pay for drug treatment for C.C., Harris stated that DHR would look for a facility that accepted Medicaid. The guardian ad litem argued to the juvenile court that C.C. was “a victim of DHR’s budgetary cuts” and informed the court that Bradford Health Services (“Bradford”) operated a local adolescent drug-treatment facility to which C.C. could be sent and for which, the guardian ad litem maintained, DHR should pay.
At the conclusion of the hearing, Judge Hundley orally stated that he wanted C.C. to have inpatient treatment for substance abuse and orally ordered DHR and the guardian ad litem to participate in an Individualized Service Program (“ISP”) meeting the following day, August 17, 2012, to discuss a treatment plan for C.C. Judge Hundley did not enter a written order memorializing his oral rulings at the August 16, 2012, hearing.
At the August 17, 2012, ISP meeting, DHR representatives and the guardian ad litem discussed the possible placement of C.C. at two residential facilities — The Bridge and Bradford. Two independent assessments had indicated that C.C. was not eligible for inpatient treatment at either facility; DHR, nonetheless, attempted to have C.C. admitted to The Bridge or Bradford because Judge Hundley had said *488 that he wanted C.C. to have inpatient treatment.
The Bridge indicated that it did not have a bed available for C.C. Bradford, however, after initially informing DHR that inpatient treatment was not appropriate for C.C., agreed to admit him on August 21, 2012. DHR then asked Bradford to provide it with written confirmation that C.C. had been accepted for admission for inpatient treatment. Bradford initially refused, and DHR declined to place C.C. at Bradford without the written confirmation.
On August 23, 2012, the guardian ad litem filed a petition seeking to have the juvenile court hold DHR and Newton in contempt due to their failure to enroll C.C. in an inpatient treatment program. The juvenile court set the guardian ad litem’s contempt petition for a hearing on August 29, 2012. The August 29, 2012, hearing on the guardian ad litem’s contempt petition was continued until September 11, 2012, because DHR and Newton had not been served with process. DHR, Newton, and the Alabama Attorney General were given actual notice of the guardian ad litem’s petition and the hearing date before the September 11 hearing but were not properly served. DHR entered a limited appearance to object to the guardian ad li-tem’s contempt petition. DHR objected on the grounds that no written order requiring DHR to place C.C. in inpatient treatment had ever been entered and that DHR and Newton had not been properly served with process.
At the September 11, 2012, hearing, Newton testified that, when Bradford agreed to admit C.C. on August 21, 2012, he had decided to put C.C.’s placement at Bradford on “hold” and to exhaust all resources for placing C.C. at The Bridge. Newton stated that he had decided to pursue The Bridge option further because The Bridge’s treatment program was longer, more comprehensive, and, he thought, more appropriate for C.C. than Bradford’s treatment program. He explained that the Bradford program lasted 21 days and was limited to substance-abuse treatment, whereas, he said, The Bridge program could last up to 60 days and addressed behavioral as well as substance-abuse issues. Newton testified that he had spoken to Rivera concerning “what was needed to get [C.C.] into The Bridge” and that Rivera had told Newton that the decision was up to the clinical director, who would have to sign a certificate of need.
On cross-examination, Newton acknowledged that, when he asked Bradford for confirmation of C.C.’s acceptance on August 21, 2012, he knew that a bed at Bradford might not still be available for C.C. after he received the confirmation. He also acknowledged that an inpatient stay at Bradford, which did not accept Medicaid, would cost DHR $6,000, whereas a substantial portion of the inpatient stay at The Bridge would be paid by Medicaid.
Rivera testified that, on July 19, 2012, he performed a substance-abuse assessment of C.C. after receiving reports that C.C. had failed a court-ordered drug test in June 2012. Rivera said that, because C.C.’s July 19, 2012, drug test was negative and C.C. did not qualify for inpatient treatment under an eight-point criterion used by The Bridge and other treatment facilities, he recommended to DHR that C.C. be enrolled in an intensive outpatient program. Rivera opined that C.C. needed “behavioral intervention and treatment with substance-abuse components attached to it. But [C.C.’s] primary issue ... [is] not substance abuse; it [is] behavioral as a result of his mental illness ... he was not on his medication and as a result he was out of control.”
Rivera stated that, although he normally would not have submitted an application *489 that did not meet the criteria for inpatient admission, he submitted an application to The Bridge for C.C.’s inpatient admission because “DHR personnel had informed [him] that they were being pressured by the court to make this happen.” Newton said that he had “explained to [DHR personnel] that [C.C.] doesn’t meet criteria and [inpatient treatment] was inappropriate, and [DHR personnel] [had] said ‘this is what the judge wants; make it happen if you can.’ ” On Monday, August 27, 2012, Newton was notified that The Bridge had a bed available for C.C. C.C. was admitted to The Bridge on August 28, 2012.
At the conclusion of the September 11, 2012, hearing, the court announced its rulings from the bench. It found DHR in willful contempt of court, and it found Newton in willful contempt of court and fined him $250 for each of the eight days, inclusive, between August 21, 2012, when a bed became available for C.C. at Bradford, and August 28, 2012, when C.C. was admitted to The Bridge. The court ordered Newton to pay a fine totaling $2,000 by 9:00 a.m. on September 17, 2012, or to turn himself into the jail for 5 days’ incarceration plus pay the fine. In a written order dated September 18, 2012, Judge Hundley made the following finding of facts and conclusions of law:
“2. That as Ordered by this Court on August 16, 2012, an ISP was held in regard to the minor, [C.C.], on August 17, 2012, at which time the parties worked on the problems which had prevented the minor child from getting into a secure residential facility to address his problems, and the case worker assigned did as requested and obtained a placement for the minor at Bradford; said assessment being done at Bradford on August 20, 2012, with a bed becoming available at Bradford on August 21, 2012.
“3. That Tyron Newton, Assistant Director of Child Welfare and Adult Services at the Madison County Department of Human Resources, after hearing that a bed was available at Bradford for [C.C.] on August 21, 2012 intentionally failed and refused to follow this court’s order and place the child in such facility. That he inserted himself into the process, and rather than working to facilitate the order of the court, he, on his own, decided not to allow the minor to go to the facility as ordered by the court and agreed upon by the parties at the ISP and arranged by the worker. That [DHR’s] prior practice had been for placement to occur once a verbal [acceptance of admission] had been received and approved by a supervisor and program coordinator. Having understood and being fully aware of the court’s order, Mr. Newton simply stopped the transfer to the facility and had no other placement available or in the works. His actions endangered the child and the child’s welfare and violated the court’s directive. That he sought to hide his actions and only compounded his disregard for the court’s orders keeping the child out for up to eight (8) days before said minor could be placed in another available facility.
“4. That Tyron Newton’s behavior subsequent to finding placement for the minor at Bradford was an obstruction to the administration of justice and his behavior was committed in such a manner as to interrupt, disturb and hinder the court in carrying forth the rulings set forth by the court to take care of the best interests of this child.
“5. That Tyron Newton’s actions have been wilfully disobedient of this court’s command and order in that he knew the court ordered him to appear in court for a hearing on August 29, 2012 and instead he purposely traveled to *490 Jackson County, Alabama and did not appear in court and these actions were fraudulent and in bad faith disregard of the order of the court and outside the normal operating procedure in these type situations. As a result of said actions, Tyron Newton is not entitled to state-agent immunity.”

Standard of Review

“[T]he standard of review in an appeal from an adjudication of criminal contempt occurring in a civil case is whether the offense, i.e., the contempt, was proved beyond a reasonable doubt. Hicks v. Feiock, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); Combs v. Ryan’s Coal Co.,. 785 F.2d 970 (11th Cir.1986); and United States v. Turner, 812 F.2d 1552 (11th Cir.1987).... In Turner, the Court, in discussing the standard of review in a criminal-contempt case, said:
“ ‘The essential elements of the criminal contempt for which punishment has been imposed on [the defendant] are that the court entered a lawful order of reasonable specificity, [the defendant] violated it, and the violation was wilful. Guilt may be determined and punishment imposed only if each of these elements has been proved beyond a reasonable doubt.’
“Turner, 812 F.2d at 1563. The Turner court also stated, quoting Gordon v. United States, 438 F.2d 858, 868 n. 30 (5th Cir.1971):
“ ‘ “The test is whether the evidence is sufficient to justify the trial judge, as trier of the facts, in concluding beyond a reasonable doubt that the defendant was guilty, and that such evidence is inconsistent with any reasonable hypothesis of his innocence. Such is the substantial evidence test.” ’
“Turner, 812 F.2d at 1563.”
Ex parte Ferguson, 819 So.2d 626, 629 (Ala.2001).

Discussion

DHR and Newton argue, among other things, that Judge Hundley’s contempt order of September 13, 2012, is due to be reversed because it is based on the alleged disobedience of an invalid oral order. Rule 58, Ala. R. Civ. P., which governs the rendition and entry, as well as the form and sufficiency, of orders and judgments, and is applicable to the juvenile courts by virtue of Rule 1(A), Ala. R. Juv. P., states:
“A judge may render an order or judgment: (1) by executing a separate written document, (2) by including the order or judgment in a judicial opinion, (3) by endorsing upon a motion the words ‘granted,’ ‘denied,’ ‘moot,’ or words of similar import, and dating and signing or initialing it, (4) by making or causing to be made a notation in the court records, or (5) by executing and transmitting an electronic document to the electronic-filing system.”
Rule 58(a). There is no provision in Rule 58 for “oral orders.” In Ex parte Department of Mental Health, 446 So.2d 54, 56 (Ala.Civ.App.1984), this court stated:
“Section 12-12-2, [Ala.] Code 1975, provides that the district court is a court of record. Courts of record have been defined as courts whose proceedings are perpetuated in writing. Black’s Law Dictionary 425 (rev. 4th ed. 1968). Additionally, section 12-15-2 provides that the circuit and district courts shall exercise original concurrent juvenile jurisdiction sitting as the juvenile court. Hence, since the district court is a court of record and the juvenile court is part of the district court, the juvenile court must also record its proceedings....
*491 “The verbal order issued by the juvenile court on August 19, 1983 placing physical custody of William in his brother Edward and the guardian ad litem is clearly invalid as are the verbal orders issued by the court between September 9, 1983 and September 26, 1983 relating to the legal custody of William and the requirement that a plan for furnishing certain services to William be given to the court.”
See also Meek v. Meek, 54 So.3d 389, 393 (Ala.Civ.App.2010) (oral orders and judgments are invalid); and Bell v. Bell, 509 So.2d 912, 913-914 (Ala.Civ.App.1987) (same).
DHR, in fact, complied with the court’s oral directive by placing C.C. in an inpatient substance-abuse-treatment facility on August 28, 2012 — a reasonable time after the ISP meeting 11 days earlier on August 17, 2012. Judge Hundley’s oral directive contained no deadline or target date and did not specify that C.C. be placed in the first facility that would accept him. The facts that the facility in which DHR placed C.C. was not the first facility to accept him and that there was an eight-day delay following that first acceptance until C.C. was ultimately placed in a second facility cannot form the basis for a finding of contempt. That is so because the directive upon which the contempt finding was based was invalid — both by virtue of its being oral and by virtue of its lacking “reasonable specificity” as to the terms and conditions upon which any noncompliance would be based. Ex parte Ferguson, 819 So.2d at 629 (quoting United States v. Turner, 812 F.2d 1552, 1563 (11th Cir.1987)). See Nave v. Nave, 942 So.2d 372 (Ala.Civ.App.2005) (reversing a finding of contempt for failure to pay child support because the applicable provision of the parties’ divorce judgment was not reasonably specific with respect to when the father’s child-support obligation terminated).
Based on the foregoing facts and authorities, we reverse Judge Hundley’s order of September 13, 2012, insofar as it found DHR and Newton in criminal contempt, and we remand the cause with instructions to vacate the contempt finding.
REVERSED AND REMANDED.
THOMPSON, P.J., concurs.
MOORE, J., concurs in the result, with writing, which THOMAS, J., joins.
DONALDSON, J., concurs in the result, with writing.

. To the extent DHR and Newton seek relief from that part of Judge Hundley’s order commanding DHR to rescind a directive to its caseworkers, instructing them to communicate with the guardian ad litem in the underlying action only through DHR's attorneys, such relief is not available by appeal under Rule 70(A), Ala. R. Civ. P.

. Judge Hundley had not entered a written treatment order but had stated during a previous hearing that C.C. needed to be "in treatment.”