**In re James R. HOLLOWAY.**

No. 92–3085.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 12, 1993.

Decided June 11, 1993.

tone of voice and inflection, and who observed the officer's conduct on the stand, his appearance and mannerisms").

Elliott Schulder, Washington, DC, argued the cause for appellant.

Ann Simon, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With her on the briefs were Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Asst. U.S. Atty., Washington, DC.

Three organizations filed a joint amicus curiae brief. Elizabeth Taylor, Washington, DC, was on the brief for Public Defender Service for District of Columbia. (James W. Klein, Washington, DC, also entered an appearance.) William B. Moffitt, Alexandria,

VA, was on the brief for the Nat. Ass'n of Criminal Defense Lawyers. Roger M. Adelman, Washington, DC, was on the brief for the Criminal Law and Individual Rights Section of the District of Columbia Bar.

Before: MIKVA, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Chief Judge MIKVA.

STEPHEN F. WILLIAMS, Circuit Judge:

On October 8, 1991, in the course of a six-defendant drug trial (*United States v. Rascoe*), District Judge Norma Holloway Johnson entered an oral order holding one of the defense counsel, James R. Holloway, in criminal contempt. Judge Johnson later that day issued a written order and certificate of contempt pursuant to Fed.R.Crim.P. 42(a). On March 10, 1992, Judge Johnson imposed sentence in the form of a $1,000 fine. Because we find that there was an adequate basis to support the contempt conviction and no procedural error, we affirm.

### Sufficiency of the Evidence

Judge Johnson convicted appellant under 18 U.S.C. § 401, which provides that:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

Neither the contempt order, the contempt certificate, nor the record indicates which of the three subsections Judge Johnson invoked. Subsection (2) is clearly inapplicable: an attorney is not an "officer" of the court within the meaning of 18 U.S.C.

§ 401(2). See *Cammer v. United States*, 350 U.S. 399, 404–05, 76 S.Ct. 456, 458–59, 100 L.Ed. 474 (1956); *In re Brown*, 454 F.2d 999, 1003 (D.C.Cir.1971). Because we find the conviction valid under subsection (3), we need not address subsection (1).[1]

The elements of contempt under § 401(3) are straightforward. First, the alleged contemnor must "[d]isobe[y] or resist[ ] ... [the] lawful writ, process, order, rule, decree, or command" of the court. 18 U.S.C. § 401(3). Of course, the relevant order or command must be sufficiently "clear and unequivocal at the time it is issued." *Traub v. United States*, 232 F.2d 43, 47 (D.C.Cir.1955). Whether an order is clear enough depends on the context in which it is issued and the audience to which it is addressed. See, e.g., *United States v. Robinson*, 922 F.2d 1531, 1534 (11th Cir.1991); accord *United States v. Turner*, 812 F.2d 1552, 1567 (11th Cir.1987) ("[e]ven an egregiously vague order may be thought adequate to cover conduct so gross as to fall within its core.").

Second, although § 401(3) does not explicitly mention *mens rea*, wrongful intent is necessary. The disregard of authority must be willful; willfulness " 'may be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty.' " *In re Farquhar*, 492 F.2d 561, 564 (D.C.Cir. 1973) (quoting *Sykes v. United States*, 444 F.2d 928, 930 (D.C.Cir.1971)); see also *United States v. Greyhound Corp.*, 508 F.2d 529, 531–32 (7th Cir.1974) (stating that criminal contempt requires "a volitional act done by one who *knows or should reasonably be aware* that his conduct is wrongful") (emphasis added) (internal quotations omitted). While the reviewing court may not affirm if the *cited* conduct has not been contumacious, see *United States v. Lumumba*, 794 F.2d 806, 811 (2d Cir.1986), the analysis of intent properly encompasses the contemnor's behavior in related incidents such as disobedience or resistance to other orders of the court. See *id.*; see also *Farquhar*, 492 F.2d at 564 (contrasting aberrational with recurrent lapses when analyzing intent).

In deciding whether the evidence is sufficient to support a contempt conviction, we use the familiar standard for any criminal conviction, asking whether "a fair-minded and reasonable trier of fact [could] accept the evidence as probative of a defendant's guilt beyond a reasonable doubt". *In re Joyce*, 506 F.2d 373, 376 (5th Cir.1975); accord *In re Brown*, 454 F.2d 999, 1008 (D.C.Cir.1971).

The key colloquy—set forth verbatim in Judge Johnson's certificate of contempt and in Appendix A to this opinion—occurred during Holloway's direct examination of Officer Darrell Young, conducted by Holloway on behalf of his client, Kelvin Rascoe. Before that passage, Young testified that he prepared an arrest form for Rascoe—known as a "PD 163"—that contained a narrative statement of facts relating to the arrest and alleged offense. Young also confirmed the earlier testimony of Officer Edward Truesdale, who said that Young, in preparing the statement of facts for his PD 163, had relied on information provided by Truesdale and a third officer. In addition, Young confirmed Truesdale's testimony that Young had not personally observed any of the events reported in Young's PD 163. See Tr. 10/8 at 70–71, 74, 76–77; see also Tr. 9/30 at 48–49.

After eliciting that evidence, Holloway proceeded to ask Young a series of questions regarding what information did and did not appear in the fact statement of his PD 163. See Tr. 10/8 at 72–73. Following an objection, the court ruled the line of inquiry impermissible because Young had no personal knowledge about any of the information in the statement. See *id.* at 73. This ruling led to a question from Holloway, to which Young replied unequivocally, "I don't have any personal knowledge of the crime being committed"—namely, the "transaction ... in-

---

1. Accordingly, cases such as *In re McConnell*, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962); *In re Brown*, 454 F.2d 999 (D.C.Cir. 1971); *United States ex rel. Robson v. Oliver*, 470 F.2d 10 (7th Cir.1972); *United States v. Sopher*, 347 F.2d 415 (7th Cir.1965); *United States v. Meyer*, 346 F.Supp. 973 (D.D.C.1972), discussed in the Dissent at 1098–99, are, insofar as they clarify the meaning of the obstruction of justice element of § 401(1), not pertinent to this opinion. See *In re Brown*, 454 F.2d 999, 1003–04 (discussing § 401(1)), 1005–09 (discussing § 401(3)).

dicated in that first paragraph [of the PD 163]." *Id.* at 77 (latter quotation taken from appellant's question).

Now we come to the incident that is at issue and is quoted in full in Appendix A. First, Holloway asked the court for permission to mark for identification a document in the court's own case files—a "*Gerstein* statement", *i.e.*, an affidavit filed to provide a proper basis for the judicial finding of probable cause that *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), requires to justify restraint after an arrest. That document contained a narrative statement to which yet another officer, Robert Condit, had sworn after Young completed his PD 163. Holloway stated that he wanted to show Young the *Gerstein* affidavit to enable Young to compare it to his PD 163 and to offer an opinion on whether Condit photocopied the statement of facts from Young's PD 163 onto the *Gerstein* affidavit. The Court ruled that such an opinion would be "totally irrelevant". Tr. 10/8 at 78.

Holloway responded that he wanted to have Young make the comparison in preparation for a planned examination of Condit about where he obtained the information for his *Gerstein* statement. Although it is difficult to tell exactly what Holloway was trying to achieve by having Young compare the statement of facts from his PD 163 with the text of Condit's *Gerstein* affidavit (which contained an obvious photocopy of the PD 163's statement), as best as we can tell Holloway was pursuing this inquiry in a roundabout effort to avoid an earlier evidentiary ruling of the court. Whether that was his purpose or not, Judge Johnson's prior ruling is worth a look, as it parallels her ruling here and thus illuminates Holloway's state of mind.

In the prior ruling, the judge barred Holloway from attempting to impeach Officer Truesdale—the only witness with firsthand knowledge of the events surrounding the arrest—with the contents of *Young's* PD 163. See Tr. 9/30 at 50–51, 55–56. Truesdale had testified that when he confronted Rascoe while executing the search of the house, Rascoe was tossing ziplock bags containing white rocks into the air and onto the floor. Holloway confronted Truesdale with the PD 163 that *Truesdale* had prepared for Rascoe's girlfriend/codefendant, in which Truesdale stated that he saw Rascoe tossing ziplock bags containing white rocks onto the floor; Truesdale's PD 163 did not mention his tossing them into the air. See *id.* at 55–56. If Holloway could have confronted Truesdale with Young's PD 163, in which Young also stated that Rascoe was tossing the bags onto the floor (i.e., he too omitted any "into the air" reference), he could have reemphasized the "discrepancy" that he had already shown in Truesdale's testimony. Judge Johnson properly refused to allow such questioning, which would have been cumulative and which in any event lacked a foundation such as a showing that Truesdale saw Young's PD 163 and adopted it, a possibility Truesdale expressly denied. See *id.* at 49. Putting that aside, however, it appears that Holloway wanted Young to attest that Condit's affidavit contained a photocopy of the statement of facts from Young's PD 163 so that Holloway later could revisit the "into the air" discrepancy when questioning Condit.

Regardless of where Holloway may have been trying to go with his examination,[2] Judge Johnson informed him that he must first establish a foundation by inquiring whether Young had ever seen the *Gerstein* affidavit before. *Id.* at 79. Appellant asked "I cannot ask [Young] to compare the two documents?" and the court responded, "No, no, no." *Id.* at 81. After Holloway asked

---

**2.** The dissent speculates that Holloway embarked on this inquiry with the "hope[] that the jury would afford less credence to" the *Gerstein* affidavit for Rascoe if it were shown to be hearsay. See Dissent at 1095. If Holloway indulged any such hope, he never revealed it—not in his dialogues with the court during the trial, not in his pre-sentencing hearing, and not in his briefs to this court. It would seem an odd mission, as no one had offered the *Gerstein* statement, so its "credence" was presumably zero. The closest

Holloway could be said to suggesting such a purpose—and it is not very close at all—is a footnote in his Reply Brief at 15 n. 5, where he alleges that the D.C. police often use hearsay statements in *Gerstein* affidavits to insulate arresting officers from cross examination. The procedure could not have had that effect here, as Truesdale prepared at least one PD 163 and Holloway used it in his cross-examination of Truesdale.

the judge to explain her ruling, the judge obliged him, explaining yet again the prerequisite to his use of the document—"you must ask him if he has seen that document, not just those paragraphs contained in it". *Id.* at 82.

Appellant proceeded with his examination and asked Young, "Do you know what that document is?" *Id.* at 83. Yet again Judge Johnson stepped in and informed Holloway that he was not heeding her directive, telling him that "we must determine if he's ever seen it before." *Id.* Judge Johnson then herself asked the witness whether he had ever seen the document before. After the witness said, "No, Ma'am", the judge reminded Holloway about the required threshold showings and their absence. *Id.*

Appellant doggedly persisted down the precluded path and asked again if the witness knew what the document was. As before, the judge intervened, this time pointedly telling Holloway "[i]f he has never seen it before, we are not going to ask him if he knows what it is." *Id.* at 84. Appellant then tried to avoid the clear import of the judge's statement, slyly asking Young, "Have you seen it now? Have you looked at it just now?" *Id.* Young said "Yeah, I see it now", and Holloway then asked Young, "Can you now tell us what ... that document is?" *Id.*

After sustaining the prosecutor's objection, the judge laid down a clear warning: "This is the last time I'm going to tell you the objection is sustained." *Id.* Undeterred, appellant persisted in his effort to have Young look at the *Gerstein* statement and compare it with his PD 163, and asked Young whether he "recognize[d] any of the wording set forth

in that document?" *Id.* At this point Judge Johnson held him in contempt. *Id.*

In challenging the conviction, appellant argues that "the terms of the district court's 'order' concerning the permissible scope of questioning on the Condit affidavit were unclear." Appellant's Brief at 37. A study of the transcript convinces us that Judge Johnson had made herself as clear as language permits. Through her repeated explanations, the questions *she* asked the witness, and her rulings in response to objections, the judge made it plain that she would not allow the witness to compare the wording in the documents unless it were first established that the witness had seen the *Gerstein* affidavit before. Appellant and *amici* seek to interject some ambiguity into the judge's directions, but the record belies their Derrida-like efforts; Holloway's penultimate, disingenuous question—whether the witness had seen the documents "now"—makes clear that he knew what the judge meant. "To provide a defense to criminal contempt, [a] mistaken construction [of an order] must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible." *United States v. Greyhound Corp.,* 508 F.2d 529, 532 (7th Cir.1974). Moreover, an alleged contemnor may not avoid an otherwise legitimate conviction "by 'twisted interpretations' or 'tortured constructions' of the provisions of the order." *Id.* (internal citations omitted). That is exactly what Holloway seeks to do here. In context, Judge Johnson clearly conveyed the message that she would not allow Young to be questioned about Condit's affidavit unless Young had seen the affidavit before.[3]

---

3. The dissent states that the judge was unclear because she told Holloway he could "proceed" with his questioning of Young after Young stated that he had never seen the document before and because Holloway "made clear to the judge that his primary reason for calling Officer Young ... was to ask him about the preparation of the PD–163 and the *Gerstein* affidavit." Dissent at 1100. There are two problems with the dissent's theory. First, assuming arguendo that Holloway had indicated that his primary reason for calling Young was to inquire about the preparation of the documents, there was absolutely no reason for the judge to think Holloway might not wish to pursue other lines of inquiry. Holloway had already, for example, questioned Young for four

pages of transcript on his role in the search. See Tr. 10/8 at 65–69. In any event, Judge Johnson's instruction to proceed is a rote direction used every day by both trial and appellate judges. Any litigant familiar with trial or appellate practice would understand that the judge was instructing Holloway either to go on to another line of questioning or, if he had no other line of questioning, to cease and allow the government to examine Officer Young on cross. There is no basis at all for assigning the phrase the dissent's proposed meaning—i.e., that Holloway could proceed with his questioning about the document—as the judge had barred that in the immediately preceding colloquy.

Our review of the conviction under § 401(3) also requires us to decide whether a reasonable factfinder could have concluded beyond a reasonable doubt that the appellant disobeyed Judge Johnson's orders with culpable intent. Holloway's devious pretense that it would be enough if Young saw the document in court that very day (a theory that would make Judge Johnson's ruling completely meaningless) points strongly in the direction of willfulness. A "mere 'paper compliance' will support a finding of willfulness." *Greyhound,* 508 F.2d at 532. We need not, however, rest on the cited colloquy alone. Other episodes of Holloway's conduct in the *Rascoe* trial render the conclusion that he acted with culpable intent almost inescapable. See *Lumumba,* 794 F.2d at 811 (relying on non-cited conduct in the same trial as evidence of intent); *Farquhar,* 492 F.2d at 564 (similar).

The first of these occurred during a two-day pre-trial suppression hearing. Appellant was cross-examining Officer Condit in an effort to establish the defectiveness of a search warrant executed at a house where Rascoe lived; if the warrant were shown to be defective, Rascoe could have excluded crack cocaine that the police found in his hands when he was confronted during the search. Appellant's theory was that Condit knew the dwelling was a rooming house before applying for the warrant but nevertheless described the structure as a unitary dwelling in his affidavit. See Tr. 9/24 at 72–75. The witness repeatedly testified that he did not know it was a rooming house. The appellant persisted in his questioning and ultimately the judge sustained an objection and told him that he was "beating a dead horse." Tr. 9/24 at 75. The following disobedience of an explicit order then occurred:

By Mr. Holloway:

Q. After you entered the house [to execute the warrant] on March 8, you discovered, did you not, that, in fact, this was a rooming house divided up into separate rooms; right?

[The prosecutor]: Your Honor, I will object for the purpose of what they discovered on March 8 is irrelevant to this motion hearing.

The Court: What he discovered once he got in is irrelevant, and I will sustain the objection.

By Mr. Holloway:

Q. You now know, do you not, sir, that, in fact, that this residence is a rooming house?

The prosecutor: Objection, Your Honor.

The Court: Mr. Holloway, how many times do I have to tell you not to ask the question? Now, I just told you that that last question was inappropriate. You came back and asked the same question again. Now, Mr. Holloway, you are an experienced attorney, very experienced attorney, and I would not like to have to hold you in contempt of Court for defying a direct order. Do not ever ask a question again that I have just ruled is inadmissible.

(Tr. 9/24 at 75–76.)

The next morning, prior to selection of the jury, Holloway moved to withdraw as counsel in the *Rascoe* case. Tr. 9/25 at 13–14. An exchange occurred between him and the judge (set out in full in Appendix B),[4] in which the judge made clear her insistence on obedience to her rulings. In denying the motion, she assured Holloway that he should have nothing to fear because she had not held anyone in contempt in her eighteen years as a judge. At the same time, however, she warned him at least three times (see emphases) that he would be expected to comply with her orders. Prior warnings are evidence of willfulness when they go unheeded. See *In re Niblack,* 476 F.2d 930, 932 (D.C.Cir.1973).

A third incident involved the cross-examination of an expert witness, a chemist, who

---

4. The quoted passage also alludes to allegedly contemptuous conduct of Holloway from a different trial that also took place before Judge Johnson and that immediately preceded the *Rascoe* trial. See *United States v. Farrell,* Crim. No. 90-0524 (D.C. tried September 17–23, 1991). We do not need to address the question whether a reviewing court may look at incidents from other trials to evaluate the contemnor's intent, as the incidents from the *Rascoe* trial dictate affirmance. We consider the quoted passage because it shows that appellant had been warned, not because it describes other incidents not in the record before us.

had analyzed narcotics found in Rascoe's bedroom. Counsel for one of Rascoe's co-defendants had sought and had obtained an *in limine* ruling prohibiting questions about a crack pipe that was seized at the same time as the cocaine and placed in the same evidence envelope. (No criminal charges were filed against Rascoe or any of his co-defendants relating to the pipe). After ruling in the co-defendant's favor, the judge stated that "no one is going to mention that crack pipe that is in Exhibit No. 11 [the evidence envelope]". Tr. 10/3 at 11; see also *id.* at 17–18. Holloway told the court that he intended to introduce evidence about the crack pipe in Rascoe's defense case, and the judge informed Holloway that that was permissible. *Id.* at 11. Holloway later sought a further clarification of the court's ruling, asking the judge if she "would prohibit any cross-examination as to any other items [*i.e.*, the crack pipe] that would be in the [evidence envelope]?" Judge Johnson responded, "Most assuredly, because there was nothing on direct about it." *Id.* at 20.

During his cross-examination, Holloway took the envelope containing the pipe and asked the chemist if there was any "residue in that item." *Id.* at 48. Both the defense attorney who won the *in limine* ruling and the prosecutor objected, and, after sustaining the objections, Judge Johnson called Holloway to the bench and asked him why he had asked his question. After hearing the explanation, Judge Johnson found that appellant had been "determined to avoid following a direct instruction of the court", that he had asked the question about the pipes even though she had told him he "should not ask

any such questions about those pipes", and that "there is no way you misunderstood me." *Id.* at 50–51.

After reviewing the cited colloquy, the episodes of prior disobedience and the judge's explicit warnings, we find that a reasonable trier of fact could have concluded beyond a reasonable doubt that Holloway "willful[ly] disregard[ed] or disobe[yed]" Judge Johnson's orders about the permissible scope of examination of Officer Young. *Farquhar,* 492 F.2d at 564; accord *Sykes v. United States,* 444 F.2d 928, 930 (D.C.Cir.1971). Therefore all of the elements of a § 401(3) offense could properly be found.

*Use of Summary Contempt Procedure*

Appellant also alleges that it was improper for the presiding judge to employ the summary procedures of Fed.R.Crim.P. Rule 42(a) instead of the notice and hearing procedures of Rule 42(b).[5] He is mistaken.

■ A judge unquestionably has the "power, for the purpose of maintaining order in the courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him." *Taylor v. Hayes,* 418 U.S. 488, 497, 94 S.Ct. 2697, 2702–03, 41 L.Ed.2d 897 (1974) (citing *Ex parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888)). When a judge invokes that power, we review the decision that summary procedures were necessary very deferentially—for abuse of discretion. See *United States v. Meyer,* 462 F.2d 827, 843 (D.C.Cir.1972).

---

5. Fed.R.Crim.P. 42 provides:

(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court.

(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or

of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. The defendant is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

Appellant does not dispute that Judge Johnson "saw or heard the conduct constituting the [cited] contempt" and that the conduct was committed in the "actual presence of the court" as required by Rule 42(a).

■ Judge Johnson unquestionably was on solid ground in determining that the necessity of preserving order justified use of Rule 42(a). By the time the judge actually held Holloway in contempt, she had repeatedly warned him—without any apparent effect—to heed her rulings on pain of potential contempt. In the line of questioning that produced the contempt conviction, she at least three times reiterated her order about the threshold showing required to inquire about the *Gerstein* affidavit, and warned Holloway in open court that his continued inquiries violated the order. By the time Judge Johnson moved under Rule 42(a), she had a compelling need to terminate the improper questioning of Young, to deter future intentional violations of her orders, and to vindicate judicial authority to control the courtroom.

As appellant correctly notes, precedent reflects the "principle that only '[t]he least possible power adequate to the end proposed' should be used in contempt cases." *United States v. Wilson,* 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975) (quoting *Anderson v. Dunn,* 19 (6 Wheat.) U.S. 204, 231, 5 L.Ed. 242 (1821)). During the course of the trial, however, appellant repeatedly had been told that certain lines of questioning were impermissible and also that failure to comply with orders could lead to contempt. None of this worked. Moreover, in the line of questioning that led to the conviction, Judge Johnson tried a variety of less drastic measures before holding appellant in contempt—explaining the basis for her ruling and reiterating the order, intervening to conduct the critical questioning herself, issuing another, more pointed, warning, and finally saying, "Mr. Holloway, this is the last time I'm going to tell you the objection is sustained." Tr. 10/8 at 84. Only then did the judge hold appellant in summary contempt. Given her heroic efforts to win compliance, one is hard pressed to see what lesser remedy she could reasonably have employed. The record certainly gives no basis for thinking that more orders, warnings, or threats would have produced improvement.

Finally, Holloway claims that the interest in a "fair and impartial assessment of the charges" required Judge Johnson to forego Rule 42(a)'s summary procedures and to refer the matter to another judge. The cases indeed bar the use of summary contempt procedures when alleged misconduct is of "such a personal nature" as to create actual or likely "embroilment" between the judge and alleged contemnor, or where "the judge adopts an adversary posture with respect to the alleged contemnor, even if he has not been personally attacked." *United States v. Meyer,* 462 F.2d 827, 841 (D.C.Cir.1972); accord *Taylor v. Hayes,* 418 U.S. 488, 501, 503, 94 S.Ct. 2697, 2704, 2705, 41 L.Ed.2d 897 (1974). Neither is present here. Holloway made no personal attacks on the judge. Compare *Mayberry v. Pennsylvania,* 400 U.S. 455, 456, 458, 91 S.Ct. 499, 500, 501, 27 L.Ed.2d 532 (1971) (contempt could not be tried by presiding judge after alleged contemnor in open court called the judge, *inter alia,* a "dirty sonofabitch," and told him to "[g]o to hell"). Nor is there any evidence that Judge Johnson adopted an adversary posture with respect to the appellant—unless we treat as such her insistence on remaining in charge. But to do so would seem to rule out summary contempt across the board, which Rule 42 plainly does not contemplate.

### Propriety of the Sentence

■ Finally, appellant claims that Judge Johnson's sentence on the contempt conviction—a $1,000 fine—was excessive.[6] We review a criminal contempt sentence for "abuse of discretion", *Green v. United States,* 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672 (1958), but with a direct power to revise. Noting that Congress had imposed no specific limit on contempt punishments, Justice Harlan wrote in *Green* that "[a]ppellate courts have ... a special responsibility for determining that the [contempt] power is not

6. Appellant does not challenge the propriety of the district judge's order barring him from appearing in her courtroom. Compare Dissent at 1102 (discussing propriety of the bar). See Appellant's Brief at 2 (presenting statement of issues), 46–47 (discussing the order solely when arguing that appellant should have been tried by another judge under Fed.R.Crim.P. 42(b)); Reply Brief at 17 (same).

abused, to be exercised if necessary by revising themselves the sentences imposed." *Id.* When assessing the propriety of a sentence, this court considers factors such as "the necessity of achieving compliance with the court's order, the gravity of the offense, ... the importance of deterring such acts in the future," and "the financial resources of the offending party." *Drivers, Chauffeurs and Helpers Local No. 639 v. Penello,* 420 F.2d 632, 634 (D.C.Cir.1969).

After considering those factors, we do not find the fine excessive. First, we are unpersuaded by Holloway's argument that because he obeyed after being held in contempt (and evidently engaged in no further misconduct thereafter), and because Judge Johnson did not actually impose the fine until months after the event, we may infer that a $1,000 fine was unnecessary to gain compliance with the order. Such an argument is nonsense; as soon as Judge Johnson held Holloway in contempt, he was on notice that something would happen, possibly something quite drastic. If we reduce the fine to a trivial amount, future contemnors will face less of a hazard. Similarly, while we appreciate that as an assistant federal public defender Holloway does not earn a salary at the top of the range for lawyers, the fine cannot have a material deterrent effect if it is trivial. In addition, while the conduct at issue did not involve threats toward the judge or disrespectful conduct, it is nonetheless serious to ignore one's duty to "protect the processes of orderly trial, which is the supreme object of the lawyer's calling." *Offutt v. United States,* 348 U.S. 11, 13, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) (Frankfurter, J.) (quoting *Sacher v. United States,* 343 U.S. 1, 14, 72 S.Ct. 451, 457, 96 L.Ed. 717 (1952)). Finally, we note that Holloway was no courtroom tyro: he has practiced for twelve years, and "has been engaged in the practice of federal criminal defense work exclusively for over ten (10) years" with Federal Defender Offices in Chicago, the Virgin Islands, and Washington, D.C. *Affidavit of James R. Holloway* at 2, filed with Motion to Vacate Conviction. During those years, appellant has "represented hundreds of criminal defendants." *Pre–Sentencing Statement of James R. Holloway,* Sent.Tr. 3/10/92 at 15. Given Holloway's

willingness repeatedly to disregard the judge's orders, and thereby also to undermine the court's authority, we do not think it an abuse of discretion to assess punishment in the form of a $1,000 fine.

\*    \*    \*

Appellant and *amici* have embellished their briefs with unexceptionable remarks about the critical role that an independent and unbowed bar plays in preserving the liberty that defines our nation and that we are sworn to protect. We agree. As the Supreme Court stated in *In re McConnell:*

> it is ... essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice.

370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962).

Nonetheless, the advocate in our legal system is expected to abide by the rulings of the presiding judge. "[I]f the ruling is adverse, it is not counsel's right to resist it ... his right is only respectfully to preserve his point for appeal." *Sacher v. United States,* 343 U.S. 1, 9, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952). Absent such a requirement, trials would wander down every by-way, no matter how impermissible, in a sprawling chaos that would render the adjudication close to random. In the long run, such chaos is hardly in the interests of defendants as a whole, much less in the interest of society.

The judgment of conviction and sentence are affirmed.

*So ordered.*

### APPENDIX A

On October 8, 1991, during trial in *United States v. Rascoe,* the following colloquy occurred. It was cited in full by Judge Johnson as the basis for her contempt conviction of appellant James R. Holloway.

> [Tr. 10/8, p. 77] Mr. Holloway: Judge, I would like to mark something that's in the file and show the witness something that's in the file.

The Court: No. You can tell me what you want from the file, and Mrs. Pacori will get it out, but you are not going to mark anything in that file.

Mr. Holloway: There's a paperclip where it is.

The Court: Tell me what you want.

Mr. Holloway: There's a paperclip where it is.

The Court: Pass me the file.

Mr. Holloway: There's a pink paperclip.

The Court: You'd better approach the bench.

(At the bench)

The Court: Why do you choose to show this to that officer?

Mr. Holloway: Judge, that is the statement of facts that he wrote on the 163 word-for-word. I'm going to show it to him and ask him to compare the statement in that document to the [Tr. 10/8, p. 78] statement of facts that he wrote on the 163 he compared, and to compare those two statements as to whether they are identical or not.

The Court: Well, this statement is sworn to on the 9th of March, 1991, and it is sworn to by Robert Condit. So, maybe Robert Condit chose to take that man's statement exactly. How can he tell us where Condit got this from? This thing—

Mr. Holloway: That was not my question. My only question would be to ask him to look at that and compare it to the statement that he prepared and to give us—to give us his indication of whether this statement—how that statement compares to the statement that he wrote.

The Court: Totally irrelevant.

Mr. Holloway: It's very relevant, Judge. It's the foundation I'm laying for questions to Officer Condit as to that statement of facts and where it came from, and whether that statement represents the statement of facts that was prepared by this witness, and whether he got that statement of facts from the 163 statement of facts prepared by this witness. And Your Honor can look at them. I will bring the 163 up here so you can look at it.

The Court: You don't have to.

Mr. Holloway: They're identical. They're word-for-word, identical.

The Court: So?

[Tr. 10/8, p. 79] Mr. Holloway: In fact, it looks like it's been xeroxed, that the statement of facts from the 163 has been xeroxed onto this Gerstein statement of facts that was filed.

The Court: The what?

Mr. Holloway: Gerstein, G-E-R-S-T-E-I-N, the statement of facts that was filed in the Superior Court the following day.

The Court: But my point to you, Mr. Holloway, and I will repeat it again, that 163 is dated March 8, 1991, is it not?

Mr. Holloway: Yes.

The Court: All right. This statement is sworn to on the 9th of March, 1991.

Mr. Holloway: But it could have been prepared on the 8th, Judge. We can ask the witness if he knows. Just because it was sworn on the 9th—

The Court: Excuse me, Mr. Holloway. There is absolutely nothing on here that demonstrates that this witness, Mr. Young, has ever seen this particular document before. There is absolutely nothing.

Now, if you want to present it to him and ask him if he has ever seen this particular document before, and not its contents, but the document itself, I will permit you to do that. But because it may have the same contents, because in fact Condit may have just taken his 163 and xeroxed it to swear to it doesn't carry any more weight than that.

[Tr. 10/8, p. 80] Now, if you want to give this to this witness to determine whether he has ever seen this document before as opposed to these contents, I would think that that would be relevant. I will hear from you.

Mr. Christian: Your honor, I don't think he can cross examine this witness as to the contents provided in that document that is sworn to by, I believe, Officer Condit. He can show him, but other than cross-examining or questioning him about the contents, I don't think he should be permitted to.

The Court: As I said, I don't see its relevance. It appears improper to me. Anybody else care to be heard?

Mr. Huebner: No, your Honor, thank you.

The Court: All right. As I said, I am always very particular about doing this. If there is ever to your knowledge again any document in the official court jacket that you might like to use, tell my clerk and we will see if we can arrange to xerox it for you, because I'm not going to let you bother with this. Nothing should be removed from this jacket save by the clerk of court, under the rules of court, all right. So, if you ever, ever need anything again, simply ask us and we will be happy to do it, okay.

You may pass that to Mrs. Pacori or you may use it as you see fit.

[Tr. 10/8, p. 81] Mr. Holloway: Thanks judge.

The Court: Pursuant to my instructions, of course. I guess I'd better tell you that.

Mr. Holloway: Judge, can I have it—can I have it removed?

The Court: No, you may not. No, sir, not now. No, sir.

Mr. Holloway: I can't have it marked either?

The Court: No.

Mr. Holloway: Can I have a copy made? Can I have a copy made?

The Court: We don't have time to do that now. You have it marked with that pink paperclip, and that's as much marking as you are going to do.

Mr. Holloway: I need to identify it for the record.

The Court: You will have to identify it by the fact that it's a March 19—a March 9, 1991, affidavit by Robert Condit. That's all you can do right now. Later today I can get Mrs. Pacori to do it but not now. That's it, Mr. Holloway.

Mr. Holloway: Is Your Honor—just clarification as to what I can ask or not ask.

The Court: I have already told you the limits.

Mr. Holloway: I cannot ask him to compare the two documents?

The Court: No, no, no.

[Tr. 10/8, p. 82] Mr. Holloway: Why is that improper, Judge?

The Court: If this man has never seen that document before—and that's why I told you you must ask him if he has seen that document, not just those paragraphs contained on it—then he can't testify to it.

Mr. Holloway: Well, can he look at it now? I mean, can he look at it now and compare it.

The Court: He may not compare it until you have made certain determinations, Mr. Holloway. And I don't know how often I have to say that. That's the third time I have repeated it.

(In open court:)

The Court: Mr. Young, if you will come back now, please.

Why don't you use the pink—keep the pink paperclip on it so we can use that as an identifying mark.

*By Mr. Holloway:*

Q: Sir, I'm showing you a document entitled "United States v. Kelvin Rascoe." It is a document dated March 9, 1991.

Mr. Christian: Your Honor, he can identify it if he can recognize it.

The Court: He can say that. Go ahead.

*By Mr. Holloway:*

Q: It is a document dated March 9, 1991. It is signed by Robert W. Condit, and it has the number 91–0183 on it and it [Tr. 10/8, p. 83] has a pink paperclip. Would you look at this please.

The Court: He's asking you to look at it to determine whether or not you have ever seen that document before.

*By Mr. Holloway:*

Q: Have you had a chance to look at it?

A: Yes, I have.

Q: Okay. Do you know what that document is?

The Court: No, no, no. First of all, we just determine if he's ever seen it before. That's the first step.

Have you ever seen that document before now?

Mr. Holloway: Judge—

The Witness: No, ma'am.

Mr. Holloway: Judge, I would ask the Court to allow counsel to complete his examination.

The Court: Excuse me, Mr. Holloway. The purpose of our last bench conference in which I ruled on that legal question said that the first thing you just do is determine whether he has ever seen this document before, and his answer is no, he has not seen it before today.

Was not that your answer?

The Witness: Yes, ma'am.

The Court: You may proceed.

By Mr. Holloway:

Q: Do you know what that document is?

Mr. Christian: Objection, Your Honor.

[Tr. 10/8, p. 84] The Court: If he has never seen it before, we are not going to ask him if he knows what it is.

By Mr. Holloway:

Q: Have you seen it now? Have you looked at it just now?

A: Yeah, I see it now.

Q: Okay. Having looked at it now, can you now tell us what it is, what that document is?

Mr. Christian: Objection, Your Honor.

The Court: The objection is sustained. And, Mr. Holloway, this is the last time I'm going to tell you the objection is sustained.

By Mr. Holloway:

Q. Do you recognize any of the wording set forth in that document?

Mr. Christian: Objection, Your Honor.

The Court: Mr. Holloway, approach the bench, please.

(At the bench:)

The Court: Mr. Holloway, I hold you in summary contempt of this court and I shall sentence you at the conclusion of this trial. Ask another question—ask that question another way and I shall hold you in summary contempt again.

Mr. Holloway: Your Honor—

The Court: I have ruled.

Mr. Holloway: Your Honor—

[Tr. 10/8, p. 85] The Court: Let's proceed.

Mr. Holloway: May I make—

The Court: There is nothing for you to say after a ruling.

(In open court:)

The Court: Mr. Young, you may resume the witness stand.

Mr. Holloway: That's all I have, Your Honor. Thank you. Thank you, sir.

### APPENDIX B

[Tr. 9/25, p. 33] By Mr. Holloway: [B]ecause of indications by the court that you would hold me in contempt, as you indicated yesterday, and having indicated on two previous occasions in the prior trial that just completed on Monday of this week, that I felt as though my effectiveness in representing Mr. Rascoe stood the good prospect of being diminished because of fear of a contempt citation in the course of my conduct in the course of this trial.

Your Honor indicated yesterday morning, after a question, that if—I don't recall Your Honor's exact words—if I asked another question that I think you had sustained objection to that you would hold me in contempt. It was my belief at the time that I had asked a different question, that I had not asked the question that Your Honor had sustained objection to, and I believe that I had a good faith basis for asking the question and that it was incumbent upon me to try to get a response to a question that I had both a good faith basis to ask and a well-founded view of its relevance. Your Honor once again indicated the possibility of contempt. And [Tr. 9/25, p. 34] after that I really began to really search my own soul, if you will, as to my effectiveness, in that I do have and will have constantly in the back of my mind the prospect that Your Honor may see fit to cite me for contempt for some activity in the course of the trial and because of, as I said, on two previous occasions, your Honor had so indicated.

\*    \*    \*    \*    \*    \*

[Tr. 9/25, p. 35] I would like to say to the court that I do not intentionally violate any

court orders, any of the orders of the court, that if Your Honor has indicated in the past[ ] that I have asked questions [ ] that I have asked questions more than once, I would just say to the court that I—it is often times hard for me to personally keep as good track as to where I am in my notes as I would want to, and I would also tell Your Honor that I'm a human being.

\* \* \* \* \* \*

The Court: Mr. Holloway, there is nothing unusual about that and, God knows being a human being myself, you can rest assured. I know the frailties of humanity. So, you don't have to waste time on that.

\* \* \* \* \* \*

[Tr. 9/25, p. 36] The Court: Thank you very much sir. [ ] Very well. Mr. Rascoe, you have heard this motion that has been filed by your attorney, and I have given him an opportunity to expound on what he had written, and I want you to know that you have no reason to fear that your attorney can represent you effectively. He represented very effectively the client in the previous case that he refers to. He is an attorney with eleven and a half years of experience. He is not a neophyte. He will be able to represent you as zealously as he can represent anyone else. He will only be found in contempt of court if his conduct is contemptuous. All of us can be contemptuous from time to [Tr. 9/25, p. 37] time, and that is the only way that he or any other lawyer in this city will ever be found in contempt of court by me is if they are contemptuous. As long as Mr. Holloway is not contemptuous, he has not one thing to worry about, and he knows that. He knows what the law is with respect to contempt, and he knows that unless he behaves contemptuously, there is no possible way for him to be held in contempt of court.

I am sure that I have not held an attorney in contempt of court in over 18 years, because most lawyers, like Mr. Holloway, know how to conduct themselves. If Mr. Holloway did not know how to conduct himself, I'm sure he would not be an Assistant Federal Public Defender. I'm sure he would not even be in his position if he did not know how to conduct himself.

*But, Mr. Holloway did, unfortunately, forget himself one day last week. After asking him five times to be seated and his refusal to move, I had to do something. I could not proceed. I couldn't bring my jury into the court room because he refused to move. So, if he were to do that in here today during your case and I asked him to please be seated, I've got to move on, and he refuses a direct order and certainly not one that said stand on your head, Mr. Holloway, for ten minutes, simply would you please take your seat so that I can bring the jury in, then, yes, that is what is known as contempt of court. That is known as contemptuous conduct.*

[Tr. 9/25, p. 38] I have every reason to believe that since Mr. Holloway engaged in that contemptuous conduct that day and I chose not to hold him in contempt of court, because I know how it hurts an attorney if he is held in contempt of court, that is no reason for him to fear being held in contempt of court. All he has to do is not engage in contemptuous conduct, because, you see, Mr. Holloway, I could have held you in summary contempt right then and I could have locked you up right then. But I said to myself, there is something wrong here. Let me give him a little extra time to recognize the error of his ways. Here a judge is asking him to be seated so that she can proceed with the trial and he refuses to. Let me give him a little time to think. And I had my clerk come back from the door where she was poised to open the door to let the jury in whenever I was able to bring the jury in and to call to ask that not the marshall who was sitting in my courtroom but another marshall come up. And I told you very distinctly, I said, "Now, Mr. Holloway, if you are still standing here when that marshall comes upstairs, I shall have to hold you in summary contempt of the court." You found a way to sit down.

So, it is not I, Mr. Holloway. I have no problems with you or anyone else, zealously representing the interests of your client, but I do have a responsibility myself to the

effective administration of justice. It is not a matter of just the lawyer or just the prosecutor or the prosecutor and [Tr. 9/25, p. 39] the defense bar. All three of us must work together. *You have certain responsibilities. I have the responsibility to rule on certain issues, and when I rule on those issues, I expect all officers of the court, be they male, female, young or old, to comply with the rulings of the court.*

Your motion is denied. There is absolutely nothing inconsistent with your being able to represent Mr. Rascoe and your professional interest. *There's no reason for you to fear being held in contempt of court, because you will certainly be given full notice of it. I can't promise that I will give you as much notice as I gave you the day you refused to take your seat when I told you to be seated. I can't promise you I will give you that much notice again by calling downstairs and giving you time to think while the marshall came upstairs. I can't promise you I will do that again, but I can promise you that I have not held a lawyer in contempt in over 18 years, hope that I don't ever have to hold another lawyer in contempt, but I must perform my function as well. If you will remember your function and remember the court's function, there will be no problems. And it is so ordered.*

MIKVA, Chief Judge, dissenting:

This is a most troublesome case. A young public defender has been permanently tarnished by a summary contempt conviction for seeking to perform as an advocate exercising warm zeal in a criminal case. The trial judge, after an unrelated dispute in another case, and after denying Mr. Holloway's request to withdraw from this case, summarily held Mr. Holloway in contempt of court. The certified contempt charge cited Mr. Holloway for "posing questions which the court had already ruled impermissible." The majority commendably attaches a transcript of the pertinent colloquy between the trial judge and the advocate. I cannot peruse that transcript without being convinced that the messages of the trial judge were confusing and ambiguous. Nevertheless, the ma-

jority holds today that a public defender must resolve all doubts against his own client and shrink from his ethical duty to represent his client zealously and to the fullest extent under the law. If an attorney misunderstands a court's ruling, or misinterprets the limits imposed upon him by the court, he may be summarily convicted of criminal contempt, and jailed, fined, or both, simply for asking a question that was arguably within the ambiguous limits set by the court. I dissent.

### I.

In April 1991, Mr. Holloway represented Kelvin Rascoe on a charge of possession with intent to distribute crack cocaine in a multi-defendant trial before Judge Norma Holloway Johnson. During the suppression hearing, Judge Johnson threatened Mr. Holloway with contempt when he attempted to re-phrase a question that she had previously ruled was impermissible. The threat of contempt shocked Mr. Holloway, and led him to believe that his representation of Mr. Rascoe would be jeopardized by the judge's obvious inclination to resort to contempt for any minor infraction of her orders. It occurred to Mr. Holloway that perhaps the tension generated between himself and the judge in a previous trial had not yet subsided and was infecting their working relationship. The next morning, before jury selection began, Mr. Holloway moved to withdraw as counsel for Mr. Rascoe. Mr. Holloway stated:

[B]ecause of indications by the court that you would hold me in contempt, as you indicated yesterday, and having indicated on two previous occasions in the prior trial that just completed on Monday of this week, that I felt as though my effectiveness in representing Mr. Rascoe stood the good prospect of being diminished because of fear of a contempt citation in the course of my conduct in the course of this trial . . .

I would like to say to the court that I do not intentionally violate any court orders. . . . I would just say to the court that I—it is oftentimes hard for me to personally keep as good track as to where I am in my notes as I would want to, and I

would also tell Your Honor that I'm a human being.

Judge Johnson refused to allow Mr. Holloway to withdraw as counsel. She explained to Mr. Rascoe that although Mr. Holloway "forgot himself one day last week" when he refused to move after she asked him to be seated, Mr. Holloway "knows what the law is with respect to contempt, and knows that unless he behaves contemptuously there is no possible way for him to be held in contempt of court."

### A. The Incident Giving Rise to the Contempt Conviction

The evidence at trial showed that Mr. Rascoe was arrested with his five co-defendants on March 8, 1991, when police executed a search warrant at a two-story rowhouse which contained a quantity of crack cocaine. Mr. Rascoe was found in a bedroom on the second floor with his girlfriend, Tammy Felton. Mr. Rascoe's defense to the charge of possession with intent to distribute was that the drugs found in the bedroom were not his, but rather his girlfriend's, and that she possessed the drugs for her own personal use.

The government's case against Mr. Rascoe rested on the testimony of a single police officer, Edward Truesdale. Officer Truesdale testified that while executing the warrant, he entered a second floor bedroom and saw Mr. Rascoe standing in front of a couch tossing numerous ziplock bags of crack cocaine. Other officers who entered the bedroom did not see Rascoe toss any objects. One of those officers, Bradley Belden, was on Officer Truesdale's heels as he burst through the bedroom door, but did not see Mr. Rascoe throw anything as they entered the room. According to Officer Belden, Mr. Rascoe was simply standing in front of the couch when the officers entered the room.

Shortly after Rascoe's arrest, Officer Truesdale gave an account of the circumstances of the arrest to a fellow officer, Officer Young, who typed the information onto an arrest form, commonly called a "PD-163." Officer Truesdale's statement was then photocopied and inserted onto a "*Gerstein* affidavit" which was sworn to by a third police officer, Officer Condit. *See Gerstein v.*

*Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (requiring sworn evidence, which may contain hearsay, establishing probable cause). Neither Officer Young nor Officer Condit was present in the bedroom at the time of Mr. Rascoe's arrest, and neither officer had personal knowledge of the surrounding circumstances.

Because Officer Truesdale's testimony was the only evidence that linked Mr. Rascoe to actual physical possession of any drugs, Mr. Holloway believed it was critical to the government's case against his client. In an effort to lay a proper foundation for use of the PD-163 and the *Gerstein* affidavit to challenge Officer Truesdale's testimony, Mr. Holloway called Officer Young as an adverse witness in Rascoe's case-in-chief. Mr. Holloway sought to explain to the jury, through Officer Young's testimony, that the *Gerstein* affidavit constituted triple-level hearsay. Mr. Holloway had already attempted, earlier in the trial, to question Officer Truesdale about his statement recorded in the PD-163, but Judge Johnson cut off his line of questioning because Officer Truesdale was not the author of the document. By calling Officer Young to the stand, Mr. Holloway hoped to expose the questionable police practice where an arresting officer's statement is typed on to a PD-163 form by one officer, and then photocopied and sworn to by a third officer. Mr. Holloway hoped that the jury would afford less credence to the statement of facts in the *Gerstein* affidavit if Officer Young admitted to the jury that the *Gerstein* affidavit, which was sworn to by Officer Condit, consisted entirely of hearsay, and was actually a photocopy of the PD-163 statement that Officer Young had prepared.

Before Mr. Holloway could commence his examination of Officer Young, Judge Johnson called him to the bench and asked him to explain the relevance of his line of questioning. Mr. Holloway told Judge Johnson that the PD-163 and the *Gerstein* affidavit were "word-for-word identical" and that he was attempting to lay a foundation for questioning Officer Condit, the officer who swore to the *Gerstein* affidavit. At this point, the following colloquy occurred:

The Court: Excuse me, Mr. Holloway. There is absolutely nothing on [this affidavit] that demonstrates that this witness, Mr. Young, has ever seen this particular document before. There is absolutely nothing.

Now, if you want to present it to him and ask him if he has ever seen this particular document before, and not its contents, but the document itself, I will permit you to do that. But because it may have the same contents, because in fact Condit may have just taken his 163 and xeroxed it, to swear to it doesn't carry any more weight than that.

Now, if you want to give this to this witness to determine whether he has ever seen this document before as opposed to these contents, I would think that would be relevant. I will hear from you.

The Prosecutor: Your Honor, I don't think he can cross-examine this witness as to the contents provided in that document that is sworn to by, I believe, Officer Condit. He can show him, but other than cross-examining or questioning him about the contents, I don't think he should be permitted to.

The Court: As I said, I don't see its relevance. It appears improper to me.

Anybody else care to be heard?

Other Defense Counsel: No, Your Honor. Thank you.

\* \* \*

The court then gave several procedural instructions regarding the removal of the affidavit from the court jacket. Mr. Holloway asked if he could remove the document from the jacket and have it marked into evidence, but the court denied those requests. At the end of this discussion, Mr. Holloway asked for clarification of the court's earlier ruling.

Mr. Holloway: Is Your Honor—just clarification as to what I can ask or not ask.

The Court: I have already told you the limits.

Mr. Holloway: I cannot ask him to compare the two documents?

The Court: No, no, no.

Mr. Holloway: Why is that improper, Judge?

The Court: If this man has never seen that document before—and that's why I told you you must ask him if he has seen that document, not just those paragraphs contained on it—then he can't testify to it.

Mr. Holloway: Well, can he look at it now? I mean, can he look at it now and compare it?

The Court: He may not compare it until you have made certain determinations, Mr. Holloway. And I don't know how often I have to say that. That's the third time I have repeated it.

(IN OPEN COURT:)

The Court: Mr. Young, if you will come back now, please. Why don't you use the pink—keep the pink paperclip on it so we can use that as an identifying mark.

By Mr. Holloway:

Q: Sir, I'm showing you a document entitled "United States v. Kelvin Rascoe." It is a document dated March 9, 1991.

The Prosecutor: Your Honor, he can identify it if he can recognize it.

The Court: He can say that. Go ahead.

By Mr. Holloway:

Q: It is a document dated March 9, 1991. It is signed by Robert W. Condit, and it has the number 91–0183 on it, and it has a pink paperclip. Would you look at this, please.

The Court: He's asking you to look at it to determine whether or not you have ever seen that document before.

By Mr. Holloway:

Q: Have you had a chance to look at it?

A: Yes, I have.

Q: Okay. Do you know what that document is?

The Court: No, no, no. First of all, we must determine if he's ever seen it before. That's the first step.

Have you ever seen that document before now?

Mr. Holloway: Judge—

The Witness: No, ma'am.

**Mr. Holloway:** Judge, I would ask the Court to allow counsel to complete his examination.

**The Court:** Excuse me, Mr. Holloway. The purpose of our last bench conference in which I ruled on that legal question said that the first thing you must do is determine whether he has ever seen this document before, and his answer is no, he has not seen it before today.

Was not that your answer?

**The Witness:** Yes, ma'am.

**The Court:** You may proceed.

**By Mr. Holloway:**

**Q:** Do you know what that document is?

**Mr. Christian:** Objection, Your Honor.

**The Court:** If he has never seen it before, we are not going to ask him if he knows what it is.

**By Mr. Holloway:**

**Q:** Have you seen it now? Have you looked at it just now?

**A:** Yeah, I see it now.

**Q:** Okay. Having looked at it now, can you now tell us what it is, what that document is?

**The Prosecutor:** Objection, Your Honor.

**The Court:** The objection is sustained. And, Mr. Holloway, this is the last time I'm going to tell you the objection is sustained.

**By Mr. Holloway:**

**Q:** Do you recognize any of the wording set forth in that document?

**The Prosecutor:** Objection, Your Honor.

**The Court:** Mr. Holloway, approach the bench, please.

(AT THE BENCH:)

**The Court:** Mr. Holloway, I hold you in summary contempt of this Court and I shall sentence you at the conclusion of this trial. Ask another question—ask that question another way and I shall hold you in summary contempt again.

**Mr. Holloway:** Your Honor—

**The Court:** I have ruled.

**Mr. Holloway:** Your Honor—

**The Court:** Let's proceed.

**Mr. Holloway:** May I make—

**The Court:** There is nothing for you to say after a ruling.

B. *The Contempt Certificate and Sentencing*

On the same day as the incident described above, Judge Johnson issued a written order summarily adjudging Mr. Holloway in contempt of court. In the contempt certificate, the district court described its version of the events leading up to the contempt adjudication. The court's version is different from the transcript of record in significant respects, as it omits the numerous ambiguities in the exchange and portrays her directions as much clearer than they actually were. The court summarized the charge against Mr. Holloway as follows:

"Holloway attempted three times to pose a question to the witness as to the contents of the document, when the Court had, at the prior bench conference, made it abundantly clear that such questioning was improper. In defiance of the Court's explicit order not to pursue a particular line of questioning, Holloway contumaciously persisted in posing questions which the Court had already ruled impermissible."

The court further stated that the contempt "caused serious and substantial interference and delay in the proceedings ... and obstruction to the orderly administration of justice."

At the conclusion of the trial, Judge Johnson advised Mr. Holloway that he was no longer allowed to appear in her courtroom other than in connection with this case. Thereafter, Judge Johnson communicated this order to Mr. Holloway's supervisor, A.J. Kramer, the Federal Public Defender.

Mr. Holloway moved to vacate the contempt citation as well as the order barring him from appearing in Judge Johnson's courtroom. Mr. Holloway also requested that Judge Johnson refer the proceedings to another district judge. In an affidavit attached to his motion, Mr. Holloway explained that his questions were meant to establish a foundation for challenging Officer Truesdale's trial testimony, and that he did not

understand the court to have prohibited all further questions about the *Gerstein* affidavit, or to have precluded all attempts to establish that Officer Young was the author of the narrative portion of the *Gerstein* affidavit which was sworn to by Officer Condit. Mr. Holloway further suggested that because the court had allowed Officer Young to examine the document, and to respond to the question whether he had seen the document "now," Mr. Holloway believed that he was permitted to inquire whether Officer Young recognized the document's wording. Mr. Holloway emphasized that he "never would knowingly or deliberately impede or obstruct the orderly administration of justice of any court," and that he "never intended to engage in contumacious conduct in the course of his examination of Officer Young."

On March 10, 1992, immediately prior to pronouncing sentence, Judge Johnson denied Mr. Holloway's post-conviction motion on the grounds that the merits of the underlying contempt adjudication were not properly before the court at sentencing. Judge Johnson added, however, that she found "incredible" Mr. Holloway's assertion "that he did not understand the scope of the court's orders regarding permissible questions." Judge Johnson also denied his request for recusal because summary contempt was not entered against Mr. Holloway "out of any personal animosity." Judge Johnson did not address, however, Mr. Holloway's request that she vacate her directive permanently barring him from appearing in her courtroom.

Before sentence was imposed, Mr. Holloway expressed remorse over the incident and reiterated that he simply did not understand what limits the court had imposed on his questioning of the witness. Judge Johnson imposed a $1000 fine which has been stayed pending appeal.

## II.

The circumstances described in the contempt certificate do not warrant a summary contempt conviction. What occurred between Mr. Holloway and Judge Johnson was quite typical of the frequently murky and unproductive exchanges that characterize so much of trial practice. Every day, lawyers banter with judges, argue with opposing counsel, raise objections, and creatively maneuver within court orders and commands. The arguments advanced by attorneys and the orders delivered from the bench are often spontaneous and reflexive; unlike the considered arguments presented in briefs on appeal, trial attorneys are required to think on their feet, respond deftly to apparent obstacles to their clients' cause, and press forward with their clients' interests uppermost in their mind. Indeed, trial attorneys are ethically obligated to argue with the court, to challenge its actions, and to attempt to change its mind. These duties inevitably create tremendous conflict and tension between the court and counsel, and misunderstandings borne of impatience and frustration are commonplace.

Nevertheless, we have adopted this adversarial system as our own, and have entrusted to it the liberty of individuals whose fate rests in no small part on the efforts of their attorney before the court. In fact, we rely upon the aggressive conflict inherent in our adversary system to produce "just results." *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The theory is that only by providing counsel the right "to press his claim, even if it appears farfetched and untenable," *Sacher v. United States,* 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952), can we feel confident that the public interest has been advanced in both truth and fairness. *See Polk County v. Dodson,* 454 U.S. 312, 318, 102 S.Ct. 445, 449, 70 L.Ed.2d 509 (1981).

In light of the interests at stake in our adversarial system, it is incumbent upon courts to distinguish between courtroom conduct that we merely do not want to encourage, and that which merits a criminal sanction. This is especially so in the area of criminal contempt. Nowhere in our political system can an individual exercise unilateral authority comparable to that of a judge summarily convicting someone of criminal contempt. By finding someone guilty of contempt and ordering that person jailed, fined or both, a court combines the roles of grand jury, prosecutor, and judge, almost with impunity. There is no notice, no right to be

heard, no right to a jury—virtually no due process at all—for an attorney summarily held in contempt of court.

Appellate courts have not been blind to the inherent dangers of the summary contempt power. Quite to the contrary, appellate courts have sought to limit use of the contempt power in light of its capacity for "grave abuse." *In re Oliver*, 333 U.S. 257, 274, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948). The Supreme Court has made clear that "before the drastic procedures of summary contempt power may be invoked ... there must be an actual obstruction of justice." *In re McConnell*, 370 U.S. 230, 234, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962). And even where there is a threat of actual obstruction, courts are limited to "the least possible power adequate to the end proposed." *United States v. Wilson*, 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975), quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821). Where obstruction of justice is not imminent, the court is bound to follow the "normal procedure" articulated in Rule 42(b), which calls for disposition only after notice and hearing. *Harris v. United States*, 382 U.S. 162, 165, 86 S.Ct. 352, 354, 15 L.Ed.2d 240 (1965). In other words, a court's summary contempt power should be invoked only as a last resort.

### A. *Obstruction of Justice*

There is no evidence on the record that Mr. Holloway's questioning of Officer Young actually obstructed justice. *See In Re Brown*, 454 F.2d 999, 1005 (D.C.Cir.1971) ("actual, not theoretical obstruction is the test, and [ ] any claimed obstruction must be proven precisely"). Judge Johnson does not even attempt to explain how Mr. Holloway's questions obstructed the business of the court other than to make the conclusory statement that "the above-described conduct ... caused serious and substantial interference and delay in the proceedings." This claim strikes me as implausible, since the government concedes that Mr. Holloway did not raise his voice or treat the judge with disrespect, and the entire incident covers two pages of the transcript and probably con-

sumed less than a minute. As stated by the Supreme Court in *In Re McConnell*,

> The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of judicial duty.

*In Re McConnell*, 370 U.S. at 236, 82 S.Ct. at 1292.

In *In Re McConnell*, a lawyer had been repeatedly ordered to refrain from a certain line of questioning to the witness. The lawyer, after continued persistence and a warning from the judge, indicated that he would not refrain from the questioning "unless some bailiff stops us." *Id.* at 235, 82 S.Ct. at 1292. At this point, a bailiff was called and the lawyer never returned to the forbidden question. The Supreme Court reversed the attorney's conviction because it had not been "clearly shown" that "an actual obstruction of justice" occurred. *Id.*

Surely, the conduct in this case no more warrants a criminal conviction than that in *McConnell*. By the same token, other appellate courts have declined to find obstruction in cases involving conduct far more egregious than that at issue here. In *United States ex rel. Robson v. Oliver*, 470 F.2d 10 (7th Cir. 1972), for example, the defense counsel "deliberately asked a provocative and inflammatory question, unfounded in evidence, which disrupted the trial," but the contempt conviction was reversed because the court could have simply "stricken [the remarks] from the record with an appropriate instruction to the jury." And in *United States v. Meyer*, 462 F.2d 827 (D.C.Cir), *on remand*, 346 F.Supp. 973, 975 (D.D.C.1972), although the defense counsel addressed the court in an "insulting, derogatory and disrespectful" manner, and repeatedly resisted the court's instructions to cease argument and be seated, the government failed to establish actual obstruction of justice. *See also, United States v. Sopher*, 347 F.2d 415, 418 (7th Cir.1965) (although defense counsel knowingly made material misstatements of fact in his closing argument, the government's prompt objection and the court's immediate ruling and comment remedied the situation, and therefore there

was no clear showing that counsel "actually obstructed" the court's performance of judicial duty).

The reluctance of appellate courts to uphold contempt convictions where the evidence falls short of actual obstruction rests on the awareness that a less restrictive standard would necessarily chill desirable advocacy. If courts can hold attorneys in contempt every time their representation arguably exceeds the amorphous bounds of acceptable advocacy, some advocacy that is entirely beneficial to our judicial system inevitably will be deterred. *See* Louis S. Raveson, *Charting the Boundaries of Contempt: Ensuring Adequate Breathing Room for Advocacy,* 65 Wash.L.Rev. 743 (1990).

### B. *Willfulness and Contumacious Intent*

One of the effective means of safeguarding beneficial advocacy which has, until now, been steadfastly enforced by this Court, is the requirement that the contempt certificate must set forth facts which establish a finding of willfulness and contumacious intent beyond a reasonable doubt. *See, e.g., In Re Brown,* 454 F.2d at 1007 ("[k]nowledge that one's act is wrongful and a purpose to nevertheless do the act are prerequisites to criminal contempt"). This prudential requirement is aimed at insulating trial attorneys from contempt convictions at all times except when it is clearly established, beyond a reasonable doubt, that an attorney actually intended to flout the court's authority.

Since the aim of the intent requirement is to protect vigorous advocacy, an attorney's ethical obligation to zealously represent his clients must be factored into any determination of whether he possessed the requisite intent. Thus, it is well established in this circuit that "[g]ood faith pursuit of a plausible though mistaken alternative is antithetical to contumacious intent," *In Re Brown,* 454 F.2d at 1007, and "any ambiguity in the court's direction ... precludes the essential finding of willful and contumacious resistance to the court's authority." *See, e.g., Traub v. United States,* 232 F.2d 43, 47 (D.C.Cir.1955). As explained by this Court in *In Re Brown,* before an individual may be punished for contempt for violating a court

order, "the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed." *In Re Brown,* 454 F.2d at 1008 n. 49 (quoting *McFarland v. United States,* 295 F. 648, 650 (7th Cir.1923)).

Judge Johnson's directions to Mr. Holloway regarding what he was entitled to ask Officer Young can hardly be characterized as "clear and unequivocal." *Traub,* 232 F.2d at 47. It appears that even the prosecutor was unclear about what Mr. Holloway could ask the witness. After Judge Johnson issued her first set of instructions to Mr. Holloway regarding his questioning of Officer Young, the prosecutor replied:

> Your Honor, I don't think he can cross-examine this witness as to the contents provided in that document that is sworn to by, I believe, Officer Condit. He can show him, but other than cross-examining or questioning him about the contents, I don't think he should be permitted to.

Indeed, the whole exchange is muddled and confused. Even after a careful read of the transcript, it is still not apparent whether the court was simply prohibiting Mr. Holloway from comparing the two documents or something more.

Mr. Holloway, throughout his questioning of Officer Young, merely sought to have Officer Young acknowledge that he had provided the information which was contained in the *Gerstein* affidavit, that he had received that information from Officer Truesdale, and that a third officer, who was not present at the scene of the arrest, swore to its accuracy. That the process is convoluted is hardly the defendant's fault. Moreover, the fact that one officer is "swearing" to information that he does not know first hand is hardly a commendable practice. Yet, the practice is tolerated in our courts and the defendants must work with it.

When Judge Johnson initially provided Mr. Holloway with instructions regarding the scope of his preliminary examination of Officer Young, she stated that he could not ask Officer Young to compare the two documents until he had established whether the officer had seen the *Gerstein* affidavit before.

Then, after a protracted conversation on a procedural matter, Mr. Holloway asked for clarification of the judge's earlier ruling. Judge Johnson then stated that Mr. Holloway had to make "certain determinations" before asking Officer Young to compare the two documents, but never specified what those determinations were. Of course, it could be assumed that the "certain determinations" simply involved asking Officer Young if he had ever seen the *Gerstein* affidavit before; however, that would not explain why the judge told Mr. Holloway he could "proceed" with his questioning of the witness about the document even after the witness stated that he had never seen it before. No doubt, Mr. Holloway was confused by the court's directions to him at that point. It would have been unreasonable for Mr. Holloway to interpret "[y]ou may proceed" as an order to abandon his line of questioning, since Mr. Holloway made clear to the judge that his primary reason for calling Officer Young to the stand was to ask him about the preparation of the PD–163 and the *Gerstein* affidavit. If he was prohibited from further questioning about the document, his questioning of the witness would be over and there would be no reason to "proceed." Thus, Mr. Holloway reasonably assumed that there must be another way to approach the issue or make the "certain determinations" which were necessary to proceed with his examination. When he rephrased the question, and asked the officer if he had seen the document "now," no objection was made, and the court allowed him to continue. At this juncture, Mr. Holloway could only have believed that he had succeeded in finding a way to make the "certain determinations" despite the fact the witness had never seen the document before. Nevertheless, when Mr. Holloway asked his next question, the court summarily convicted him of contempt.

The danger in holding attorneys in contempt for violating orders that are vague, or susceptible to multiple interpretations, should be obvious. Any law or judicial order which requires people of "common intelligence [to] necessarily guess at its meaning and differ as to its application," violates due process. *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70

L.Ed. 322 (1926). That the writer of this opinion, a member of the bar for over 40 years, remains confused about the specifics of Judge Johnson's holding may only be an indication of his thick headedness. But it may also indicate that the trial court's directive was less than crystal clear.

There are real consequences to upholding contempt convictions where the instructions from the trial court are even arguably ambiguous. Attorneys, wary of the perils of proceeding in the face of mixed messages and indefinite language, will begin to resolve all doubts against their client and "restrict[ ] their conduct to that which is unquestionably safe." *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964) (discussing the chilling effect of vague prohibitions on free speech). A lawyer who is fearful of crossing a line that is less than clear to him cannot deliver the warm zeal that criminal defense attorneys must have for the process to function properly.

*Amici* in this case, the Criminal Law and Individual Rights Section of the District of Columbia Bar, the Public Defender Service for the District of Columbia, and the National Association of Criminal Defense Lawyers, support Mr. Holloway's appeal, and urge this Court to establish clear limits on the use of the summary contempt power so that attorneys will not be deterred from aggressive and vigorous advocacy on behalf of their clients. As *Amici* point out,

[a]ttorneys have a right to be persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious, when acting in their client's behalf. An attorney may with impunity take full advantage of the range of conduct that our adversary system allows. Given this extreme liberality necessary to a vital bar and thus the effective discovery of truth through the adversary process, an attorney possesses the requisite intent only if he knows or reasonably should be aware in view of all the circumstances, especially the heat of the controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth.

*In Re Dellinger,* 461 F.2d 389, 400 (7th Cir. 1972).

*Amici* argue that this Court should limit the trial court's summary contempt power by requiring a warning, a specific inquiry into counsel's intent, and the use of the least onerous alternative. Use of the least onerous alternative is, generally speaking, already a requirement for use of the summary contempt power. *See, e.g., In Re McConnell,* 370 U.S. at 233, 82 S.Ct. at 1290 (when dealing with contemptuous behavior courts should use the "least power possible" adequate to the end proposed). The other two suggestions, the requirement of a warning and a specific inquiry into counsel's intent, while not required by the language of the contempt statute or Rule 42(a), do make prudential sense. These limitations on the summary contempt power would help to define the boundaries of appropriate advocacy and insure trial attorneys that they would have sufficient notice that their activity was considered contemptuous before finding themselves convicted of a criminal offense.

Interestingly, the majority suggests that Mr. Holloway received adequate notice because Judge Johnson "three times reiterated her order about the threshold showing required to inquire about the *Gerstein* affidavit." Maj.Op. at 1086. Yet this "threshold showing" is precisely what was so unclear in Judge Johnson's orders. Certainly, the reiteration of ambiguous orders and the allowance of some, but not all, questions regarding the forbidden topic, can hardly constitute adequate notice. It would have taken but a few seconds for the court to clarify its order and explain the boundaries of permissible questioning regarding the document (if further questioning about the document was permissible at all). If there were no permissible questions after Officer Young denied seeing the document before, Judge Johnson could have prevented the confusion by simply instructing Mr. Holloway to cease his questioning of the witness. If there were permissible questions regarding the document at that point, Judge Johnson should have told Mr. Holloway what those questions were. Failure to undertake such prophylactic measures seriously undercuts the majority's claim that Judge Johnson exhibited "heroic efforts to win compliance" *see* Maj.Op. at 1087, and lends substantial support to the view that Mr. Holloway was, at most, engaged in the "good faith pursuit of a plausible though mistaken alternative." *In Re Brown,* 454 F.2d at 1007.

The majority's efforts to infer contumacious intent from other incidents of allegedly contemptuous conduct in the record are also unpersuasive. As the majority itself concedes, a criminal contempt order "must stand or fall on the sufficiency of the specification of wrongdoing upon which it is based." *Tauber v. Gordon,* 350 F.2d 843 n. 1 (3d Cir.1965) (*en banc*). If the conviction of contempt is to be sustained, the conduct complained of in the certificate must, in itself, constitute contempt. *See Hallinan v. United States,* 182 F.2d 880, 882 (9th Cir.1950), *cert. denied,* 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1951). Where the actions described in the contempt certificate, taken alone, are insufficient to support a conviction for contempt, the contempt conviction may *not* be saved by pointing to similar incidents of borderline, or even contemptuous, conduct in the record. *See Eaton v. City of Tulsa,* 415 U.S. 697, 699, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693 (1974) (contempt conviction reversed where the use of an expletive by the defendant, by itself, did not constitute an imminent threat to the administration of justice, although there were similar discourteous responses made by the defendant during the trial which may have supported the contempt conviction if cited in the contempt certificate).

The district court did not refer to or even hint that the contempt conviction was related to any past instances of misconduct. Therefore, the majority's attempt to save Mr. Holloway's conviction by combing the record in search of any minor excess of advocacy, excesses that are inevitable in any trial as heated and drawn-out as this one was, is unacceptable. In any event, the examples used by the majority are not worthy of a summary contempt charge, however irritating they might prove to some trial judges. Judge Johnson, unlike the majority, exercised appropriate restraint in not relying on those other incidents to justify the summary contempt conviction.

The majority is right about one thing, however. The contempt conviction in this case is related to a prior instance of misconduct—misconduct that occurred in a previous trial. A casual perusal of the transcript reveals that the tension generated between Judge Johnson and Mr. Holloway in the previous trial had not yet dissipated when this trial began. Mr. Holloway acknowledged this fact during the suppression hearing, and requested to withdraw as counsel for Rascoe. He explained to the court that his fear of being held in contempt arbitrarily and unpredictably would inevitably jeopardize his client's interests. Judge Johnson denied his request to withdraw, indicating that he had nothing to fear because he could avoid a contempt citation so long as he did not behave "contemptuously." The denial of the request undoubtedly stemmed from the desire to proceed with the trial in a timely fashion. But it made more imperative the judge's need to manage the trial with special sensitivity to the risks involved. Unfortunately, Mr. Holloway's instincts were correct; for doing no more than vigorously representing his client's interests in the face of an ambiguous ruling from the court, he was summarily convicted of criminal contempt.

Notably, Mr. Holloway was also barred from appearing in Judge Johnson's courtroom. This is no minor inconvenience. Mr. Holloway, an assistant public defender, is not some random attorney who wanders into our district court. His representations on behalf of indigent defendants take him daily into all the district courts. So for him, being held in criminal contempt and banished from Judge Johnson's courtroom is a serious interference with his capacity to perform.

If this case was truly about the circumstances cited in the contempt conviction, rather than the resentment which had been brewing between the judge and Mr. Holloway since the previous trial, the drastic action of barring Mr. Holloway from the courtroom and holding him in contempt would be baffling. But as it stands, it is obvious from the record that Mr. Holloway was punished not for violating a court order to refrain from a certain line of questioning, but was punished instead for a dispute that occurred in a previous trial. This use of the summary contempt power is clearly abusive, and may have interfered with Mr. Rascoe's right to receive a fundamentally fair trial from a fair and unbiased judge. *See generally, Walberg v. Israel,* 766 F.2d 1071, 1076 (7th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). Certainly, Judge Johnson's decision to proceed with Rascoe's trial after holding Mr. Holloway in contempt is vulnerable to questions. After the contempt conviction, Judge Johnson's impatience with all the defense attorneys, but particularly Mr. Holloway, is clear from the record. While Judge Johnson's irritability may be understandable given this long and arduous trial, this Court should not excuse the unwarranted consequences of her indiscretion. Trial judges are human beings, and when they make mistakes their decisions should be reversed, even if we have sympathy for the strains of their occupation.

### III.

Whether or not Mr. Holloway should have been held in contempt in the previous trial is an open question—and clearly not adjudicable in this Court on the record before us. Regardless, the circumstances in this case do not warrant a summary contempt conviction. At the very least, Judge Johnson should have utilized the "normal" procedure for adjudicating charges of criminal contempt under Rule 42(b) and afforded Mr. Holloway an opportunity to respond to the charge and explain his conduct. The fact that Mr. Holloway failed to receive even this minimal level of due process suggests that substantial resentment remained between the judge and Mr. Holloway from the previous trial, and that Mr. Holloway's request to withdraw as counsel for Rascoe should have been granted.

With the benefit of hindsight and the luxury of cool reflection, it may be possible to divine Judge Johnson's intent and decipher her instructions. One may even conclude that Mr. Holloway's conduct was not exemplary. Still, Mr. Holloway was not even close to obstructing justice and his conduct was far from "exceptional." *See Harris,* 382 U.S. at 164, 86 S.Ct. at 354 (summary contempt power should be reserved for "exceptional" cir-

cumstances). Lawyers, in the heat of a criminal trial, are not always as perceptive and sensitive to the boundaries of examination set by the trial judge as we would want them to be. Hopefully, they are educable and may mature in their perceptions and judgment. The lesson that we are teaching this young lawyer, however, is to quell his zeal in favor of placating an irritated judge. That is not a good result for the criminal justice system— nor a lesson worthy of our court's traditions.